[Cite as *State v. Ellis*, 2011-Ohio-2967.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 24003 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 09-CRB-4553 |
| v. | : | |
| | : | (Criminal Appeal from Dayton |
| ANTHONY ELLIS, JR. | : | Municipal Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 17th day of June, 2011.

. . . . . . . . . . .

JOHN DANISH, Atty. Reg. #0046639, and STEPHANIE COOK, Atty. Reg. #0067101, by
MATTHEW KORTJOHN, Atty. Reg. #0067101, City of Dayton Prosecutor's Office, 335
West Third Street, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

CHERYL L. COLLINS, Atty. Reg. #0085671, J.M. Tomb Law, LLC, 124 West Main Street,
Troy, Ohio 45373
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} This matter is before the court on defendant Anthony Ellis's appeal of his
convictions for obstructing official business, resisting his arrest, and resisting the arrest of
another. We  affirm.

# I

{¶ 2} On April 28, 2009, Dayton police officers Thomas Cope and Theodore Trupp stopped Ellis's son for a traffic violation. The car came to rest in a corner of a Rite-Aid pharmacy's parking lot. When the officers discovered that neither Ellis's son nor anyone else in the car had a driver's license, they called a tow truck. Ellis's son called home and told his parents what was happening. Ellis and his son's mother, Latisha Robinson-Williams, immediately left for the Rite-Aid in their Dodge Durango, with Ellis driving, "to stop the car from being towed." Sept. 16, 2010 Appellant's Brief, p.2, citing Tr. 321-322.[1] When they arrived, Ellis paused on the street, in front of the entrance to the parking lot nearest the scene, so that Robinson-Williams could get out. Ellis then parked alongside the curb just past the entrance, about 20 feet away.

{¶ 3} The testimony from the officers, Ellis, and Robinson-Williams about what happened next conflicts, and we will examine the pertinent parts later in our review. Suffice it to say for now that Officer Cope initiated the arrest of Robinson-Williams but needed Officer Trupp to help complete it. Officer Cope then initiated the arrest of Ellis but in the process discharged his tazer into Ellis five times before the arrest was completed.

{¶ 4} Both father and mother were charged. Ellis was charged with obstructing official business in violation of R.C. 2921.31(A) and with two counts of resisting arrest in violation of R.C. 2921.33(A), his own and Robinson-Williams's. Robinson-Williams was charged with disorderly conduct, obstructing official business, and resisting arrest. Ellis and

---

[1] We cite Ellis's brief, rather than the trial transcript directly, because pages 321, 322, 323, and 324 are missing from the record copy of the transcript.

Robinson-Williams were tried together before a jury, and both testified. In addition to other instructions, the trial court gave the jury an instruction on excessive force, an affirmative defense to resisting arrest. The jury found Robinson-Williams guilty of disorderly conduct only. But the jury found Ellis guilty of all three charges against him.

{¶ 5} Ellis appealed.

## II

{¶ 6} Ellis assigns six errors to the trial court:

### First Assignment of Error

{¶ 7} "THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF THE OFFICERS' DISCIPLINARY HISTORY CONCERNING PRIOR DISHONEST ACTS."

### Second Assignment of Error

{¶ 8} "THE TRIAL COURT ERRED IN INSTRUCTING THE JURY REGARDING AN AFFIRMATIVE DEFENSE OF EXCESSIVE FORCE."

### Third Assignment of Error

{¶ 9} "MR. ELLIS' [sic] CONVICTION FOR RESISTING THE ARREST OF ANOTHER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE STATE FAILED TO SHOW A LAWFUL ARREST BEYOND A REASONABLE DOUBT."

### Fourth Assignment of Error

{¶ 10} "MR. ELLIS' [sic] CONVICTION FOR RESISTING HIS OWN ARREST WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE STATE

FAILED TO PROVE A LAWFUL ARREST BEYOND A REASONABLE DOUBT."

**Fifth Assignment of Error**

{¶ 11} "MR. ELLIS' [sic] CONVICTION FOR OBSTRUCTING JUSTICE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT MR. ELLIS HINDERED OR IMPEDED OFFICIAL BUSINESS BEING CONDUCTED BY THE OFFICERS."

**Sixth Assignment of Error**

{¶ 12} "MR. ELLIS' [sic] CONVICTION FOR RESISTING ARREST IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE SINCE MR. ELLIS PROVED HIS AFFIRMATIVE DEFENSE OF EXCESSIVE FORCE BY A PREPONDERANCE OF THE EVIDENCE."

**I. The Exclusion of the Officers' Disciplinary History**

{¶ 13} Before trial, the state filed a motion in limine that sought to prevent Ellis from asking Officers Cope and Trupp about an instance in 2007 or 2008 when they engaged in "pyramiding," a practice prohibited by their collective bargaining agreement, and for which each received a 24-hour suspension. The trial court sustained the motion. The court believed that the issue might confuse the jury and worried that the jury might be distracted from the real issues in the case. The court noted that the suspension for pyramiding did not concern a criminal conviction but a violation of the officers' collective bargaining agreement. And, the court further noted, the issue of pyramiding was subject to arbitration proceedings, since the

agreement itself did not define the term and the union and city did not always agree on what conduct constituted it.

**{¶ 14}** In the first assignment of error, Ellis argues that under Evid.R. 608(B) he should have been allowed to question each officer about this aspect of his disciplinary history. "The decision to admit evidence of earlier misconduct of a witness for impeachment under Evid.R. 608(B) is within the sound discretion of the trial court." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, at ¶100 (Citation omitted.). A trial court errs when it abuses its discretion, defined as "an unreasonable, arbitrary, or unconscionable use of discretion, or as a view or action that no conscientious judge could honestly have taken." *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, at ¶23 (Citation omitted.).

**{¶ 15}** Evidence Rule 608 limits inquiry into a witness's prior conduct: "Specific instances of the conduct of a witness * * * may * * *, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness * * *." Evid.R. 608(B). Yet, even if such character evidence is admissible, Evidence Rule 403 requires the court to exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Ellis asserts that pyramiding is a dishonest act, evidence of the officers' character for untruthfulness.

**{¶ 16}** We cannot say that, by excluding this evidence, the trial court abused its discretion.

**{¶ 17}** The state, in its motion in limine, explained the concept of pyramiding this way:

"[Pyramiding] generally refers to the practice of clocking in on an overtime assignment before the hours on a previous overtime assignment have expired. For example, if an off-duty officer clocks in for court, he receives four hours of overtime pay regardless of the amount of time actually spent in court. If the officer leaves court before that four hour period has expired and clocks in for another overtime assignment, the officer has engaged in pyramiding." Feb. 17, 2010 Motion In Limine, p.3 (Citation to the collective bargaining agreement omitted.). Pyramiding is prohibited by the officers' collective bargaining agreement: "There shall be no pyramiding of overtime for the same hours worked." Section 4, Article 17 of the Collective Bargaining Agreement. But what conduct constitutes pyramiding is not spelled out in the agreement. And, according to the state, the city and the union are not in full agreement on this question.

{¶ 18} We do not think that the instances of pyramiding here are clearly probative of the officers' character for untruthfulness. Pyramiding is not inherently dishonest conduct. So the officers' conduct shows untruthfulness only if they engaged in it with the appropriate degree of culpability vis-à-vis the collective bargaining agreement. But whether either officer engaged in the conduct with a guilty mind is not shown by the record, nor does the record show what the conduct was that the city deemed to be pyramiding. It is conceivable therefore that, while the city thought the officers' conduct constituted pyramiding, the union thought otherwise. The officers may have simply gotten caught in the conflict. Furthermore, the trial was held in February and March 2010, and the officers' engaged in pyramiding in 2007 or 2008, up to three years before the trial. The remoteness of the conduct lessens its probative value. See *State v. Williams* (1981), 1 Ohio App.3d 156 (disallowing inquiry into witness's

alleged falsification of an employment application four years before trial).

{¶ 19} Even if Evidence Rule 608 were satisfied, we still could not say that the trial court erred. Ellis argues that there was no danger of the pyramiding issue becoming a trial-within-a-trial and distracting the jury because extrinsic evidence could not be introduced to prove the officers' conduct. See Evid.R. 608(B). While Ellis states the rule correctly, he is not correct that it removes the dangers targeted by Evidence Rule 403. As the state suggests, pyramiding is a somewhat complicated concept. Indeed, it is complicated enough that the city and union cannot always agree on what conduct is prohibited or permitted by contract. Were such testimony allowed, the jury would be placed in the position of having to decide the underlying issue of whether the officers violated the collective bargaining agreement. We cannot say that the trial court was wrong to conclude that the dangers of issue confusion and misleading the jury substantially outweighed the probative value of this evidence.

{¶ 20} Finally, Ellis argues that he should have been able to question the officers on this conduct because, under his constitutional right to confront witnesses, he must be allowed to challenge the officers' credibility. The words of the Tenth District are apt here: "We are fully aware of the critical nature of cross-examination as it affects the credibility of the state's prime witness, and the need for wide latitude in that regard. However, under Evid.R. 608(B), the ability of trial counsel to discredit a witness through cross-examination concerning particular conduct of the witness is not absolute; it is limited in its exercise to the court's sound discretion in determining if the inquiry will lead to particular instances of conduct which are clearly probative of untruthfulness." *Williams*, at 158.

{¶ 21} For the above reasons, we cannot say that the trial court's decision to exclude

the officers' disciplinary history was an abuse of its discretion.

{¶ 22} The first assignment of error is overruled.

## II. The Jury Instruction on the Affirmative Defense of Excessive Force

{¶ 23} At trial, Ellis claimed that, by tazing him five times, Officer Cope used excessive force. The trial court instructed the jury that Ellis's claim of excessive force is an affirmative defense to the charge of resisting arrest. In the second assignment of error, Ellis contends that excessive force is not an affirmative defense but is an element of the resisting-arrest offense, making it the state's burden to prove its absence. Ellis also contends that placing the burden on him to prove excessive force violated his right to due process of law.

A. *Excessive force is not an element of resisting arrest*

{¶ 24} The resisting-arrest statute prohibits a person from resisting a "lawful arrest." R.C. 2921.33(A). Ellis argues that the state failed to prove that his arrest was lawful because it failed to prove that Officer Cope did not use excessive force. Ellis contends that, as a matter of law, the use of excessive force by an arresting officer renders the arrest unlawful. Since "lawful arrest" is an element of the offense, Ellis reasons, it is the state's burden to prove that the arresting officer did not use excessive force.

{¶ 25} Excessive force is not an element of resisting arrest. Undoubtedly, "'[a] lawful arrest is an essential element of the crime of resisting arrest,'" which the state must prove. *State v. Burns*, Montgomery App. No. 22674, 2010-Ohio-2831, at ¶29, quoting *State v. Vactor*, Lorain App. No. 02CA008068, 2003-Ohio-7195, at ¶34. But "lawful arrest," in this

context, refers only to the underlying reason for the arrest: "In order to prove a lawful arrest, * * * the State must prove both 'that there was a reasonable basis to believe that an offense was committed, [and] that the offense was one for which the defendant could be lawfully arrested.'" *Burns*, at ¶29, quoting *Vactor*, at ¶34. Although this Court has not previously considered the issue raised here, other districts have, and we agree with their conclusion. The Fourth District has held that "[a] trial court properly refused to instruct the jury that the state must prove, as a part of the element of lawful arrest, the arresting officer did not use excessive or unnecessary force in arresting appellant." *State v. Thompson* (Nov. 9, 1993), Ross App. No. 92CA1906. "The use of excessive force may give rise to civil remedies or criminal defenses," the Fourth District has said, "but it does not negate the legal nature of an accused's detention for Fourth Amendment or concurrent statutory purposes." Id. Likewise, the Twelfth District has held that "'the absence of excessive or unnecessary force is not a material element of the crime of resisting arrest as defined in R.C. 2921.33.'" *Blanchester v. Newland* (Sept. 17, 1984), Clinton App. CA83-07-008. Rather, "[t]he use of unnecessary or excessive force by the arresting officer is a defense to the charge of resisting arrest." Id. Thus, the State's burden is to prove that the initiation of the arrest was lawful. Moreover, subsequent excessive force, for instance on the way to the jail or in the process of booking, should subject officers to civil liability but should not change the character of the defendant's criminal responsibility.

{¶ 26} Under Ohio law, an affirmative defense is either "(a) A defense expressly designated as affirmative; [or] (b) A defense involving an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence." R.C. 2901.05(D)(1). Ohio Jury Instructions recognizes excessive force

as an affirmative defense to resisting arrest, see 2 Ohio Jury Instructions (2009), Section 521.33(11), and cites as authority *State v. Logsdon* (Dec. 4, 1990), Seneca App. No. 13-89-10. *Logsdon* holds that "a claim of unnecessary or excessive force must be regarded as an affirmative defense to a charge of resisting arrest." *Logsdon*. It points out that the defense fits the second statutory-definition of an affirmative defense: "The defense is peculiarly within the knowledge of the defendant because only the defendant can adequately demonstrate to the trier of fact the point at which he felt he had to protect himself from the actions of the arresting officer." Id. "With an allegation of unnecessary or excessive force in a resisting arrest charge," says *Logsdon*, "a defendant attempts to excuse or justify his actions in the classic nature of an affirmative defense, i.e. 'confession and avoidance.'" Id. "Thus," *Logsdon* continues, "the defendant effectively admits his resistance, if only to show that it was necessary in order to protect himself from the officer's excessive force." Id.

B. *Placing the burden on the defendant to prove excessive force is proper*

{¶ 27} Ellis also contends that the trial court's affirmative defense instruction improperly shifted the burden of proving the offense to him.

{¶ 28} Under Ohio law, "Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. [But] [t]he burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." R.C. 2901.05(A). Non-affirmative defenses seek to negate the state's proof of an element, but affirmative defenses "represent not a mere denial or contradiction of evidence which the prosecution has offered as proof of an essential element of

the crime charged, but, rather, they represent a substantive or independent matter 'which the defendant claims exempts him from liability even if it is conceded that the facts claimed by the prosecution are true.'" *State v. Poole* (1973), 33 Ohio St.2d 18, 19. Since the burden to prove all the elements of an offense beyond a reasonable doubt rests on the state–and never shifts–no part of an affirmative defense may negate an element of the offense. *State v. Nucklos*, 171 Ohio App.3d 38, 2007-Ohio-1025, at ¶38, citing *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368; and *Patterson v. New York* (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281; and *State v. Frost* (1979), 57 Ohio St.2d 121. The burden to prove an affirmative defense therefore   may be placed on a defendant, without violating due process, so long as none of the affirmative-defense evidence raises a reasonable doubt about the state's proof that the defendant committed the charged offense. See *Martin v. Ohio* (1987), 480 U.S. 228, 233-234, 107 S.Ct. 1098, 94 L.Ed.2d 267.

{¶ 29} The trial court's instruction to the jury on "excessive force" was this:

{¶ 30} "The defendant, Anthony Ellis Jr. is asserting an affirmative defense known as excessive force. The burden of going forward with the evidence of excessive force and the burden of proving [an] affirmative defense are upon the defendant. Defendant must establish such a defense by a preponderance of the evidence. * * * If the defendant fails to establish the affirmative defense of excessive force, the prosecution still must prove to you beyond a reasonable doubt all the elements of the crime charged.

{¶ 31} "The defendant claims that arresting officers Cope and Trupp used excessive or unnecessary force in arresting him. Excessive or unnecessary force means more force than necessary under the circumstances to arrest the defendant. If you find that the prosecution

proved beyond a reasonable doubt all the essential elements of the offense of resisting arrest, then your verdict must be guilty. If you find that the prosecution failed to prove beyond a reasonable doubt any one of the essential elements of the offense of resisting arrest, then your verdict must be not guilty." (Tr. 446-447).[2]

{¶ 32} Nothing in this instruction directed the jury to consider evidence that raises doubt about any element of the resisting arrest offense. C.f. *Thompson* (rejecting appellant's argument that the excessive force affirmative defense instruction negated the state's burden to prove that the arrest was lawful, and holding that the affirmative defense instruction was proper).

{¶ 33} We conclude that the trial court's instruction was proper.

{¶ 34} The second assignment of error is overruled.

## III. The Weight of the Evidence on the Charge of Resisting the Arrest of Robinson-Williams

{¶ 35} In the third assignment of error, Ellis argues that the evidence weighs heavily against conviction for resisting the arrest of Latisha Robinson-Williams. When a defendant claims that a jury verdict is against the manifest weight of the evidence, this is the test: "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Elmore*, 111 Ohio St.3d

---

[2] In service of readability, all transcript quotations in this opinion are modified from the original transcript's use of all uppercase letters.

515, 2006-Ohio-6207, at ¶44, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. But the Ohio Supreme Court has cautioned that "'[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting *Thompkins*, at 387. We conclude that this is not such a case.

{¶ 36} Ellis contends first that the offense for which Robinson-Williams was arrested is not an arrestable offense. The resisting arrest statute prohibits a person from resisting or interfering with a "lawful arrest" of another. R.C. 2921.33(A). "In order to prove a lawful arrest, * * * the State must prove both 'that there was a reasonable basis to believe that an offense was committed, [and] that the offense was one for which the defendant could be lawfully arrested.'" *Burns*, at ¶29, quoting *Vactor*, at ¶34.

{¶ 37} Ellis asserts that Robinson-Williams was arrested for jaywalking, a minor-misdemeanor under Dayton's ordinances, see Revised Code of General Ordinances Chapter 75 and § 70.99. Under Ohio law, there is a general presumption against physically arresting a person for committing a minor misdemeanor. See R.C. 2935.26(A). But this presumption is rebutted in certain situations. See R.C. 2935.26(A)(1)-(4); see, also, *State v. Satterwhite* (1997), 123 Ohio App.3d 322, 324. One situation arises when "[t]he offender cannot or will not offer satisfactory evidence of his identity." R.C. 2935.26(A)(2).

{¶ 38} Pertinent to this issue is the following testimony from Officer Cope:

{¶ 39} "Q: Alright, so you've given her [Robinson-Williams] a warning, you said she's [flailing] her arms, at some point you said you asked for I.D.?

{¶ 40} "A: Yes.

{¶ 41} "* * *

{¶ 42} "Q: And what happens when you ask for the I.D.?

{¶ 43} "A: She basically said she wasn't going to give it to me, which at that point, I told her that's fine then you're going to go to jail. * * *" (Tr. 111).

{¶ 44} Officer Trupp's testimony corroborates Cope's: "Officer Cope asked her for her I.D. and she told Officer Cope that she's not giving him shit." (Tr. 204).

{¶ 45} The jury reasonably could have believed the officers' testimony and found that Robinson-Williams would not give them evidence of her identity. Therefore they would have had a reasonable basis to arrest her for jaywalking, despite the fact that it is a minor misdemeanor.

{¶ 46} The jury also reasonably could have believed the officers' testimony that Robinson-Williams was not arrested for jaywalking but for disorderly conduct. Robinson-Williams testified, and the testimony of a tow-truck driver, who was at the scene to pick up the car that Ellis's son had been driving, suggests, that Officer Cope arrested Robinson-Williams for jaywalking. But Officer Cope testified otherwise. When defense counsel asked him, "[D]id you tell anyone that you were going to arrest them for jaywalking that day?," he replied, "No, I did not." (Tr. 165). When Cope was asked, "What was the purpose for asking for [Robinson-Williams's] I.D.?," he replied, "I was going to issue a citation for disorderly conduct." (Tr. 111). Cope testified that, after Robinson-Williams refused to give him any identification, he said to her, "You're under arrest for obstruction of official business and disorderly conduct." (Tr. 111). Officer Trupp's testimony corroborates Cope's: "Officer Cope asked her [Robinson-Williams] if he could help her with anything,

that's when she responded, 'Why are you towing my mother fucking car.' He explained to her the situation, she continued to yell at Officer Cope. Officer Cope told her to calm down or she would be issued a citation for disorderly conduct if she continued to yell." (Tr. 203-204). Trupp was later asked directly what Robinson-Williams was being arrested for. He replied, "Disorderly conduct." (Tr. 223).

{¶ 47} Ellis next contends that even if she were arrested for disorderly conduct, Officer Cope lacked a reasonable basis to believe that Robinson-Williams had committed the offense. "[A] 'lawful arrest' for disorderly conduct occurs regardless of whether the alleged offender is ultimately convicted if the officer had reasonable grounds to believe that the accused was recklessly causing inconvenience, annoyance or alarm to him by abusive language, and that the individual's language and conduct was likely to provoke a violent response. * * * [T]he test is objective and [] the officer need not in fact be inconvenienced, annoyed or alarmed, or personally provoked to a violent response." *State v. Sansalone* (1991), 71 Ohio App.3d 284, 286 (Citation omitted.); R.C. 2917.11 (disorderly conduct statute). "The question, instead, focuses on whether, under the circumstances, it is probable that a reasonable police officer would find the accused's language and conduct annoying or alarming and would be provoked to want to respond violently." *Sansalone*, at 286 (Citation omitted.).

{¶ 48} In addition to his just-quoted testimony about Robinson-Williams's language and conduct, Officer Cope also said: "[S]he asked me why I was towing the car. I told her, I explained to her that it was being towed because the guy doesn't have a license and nobody in the car has a license. That's when she told me I wasn't going to tow the car. * * * She was yelling, screaming, cussing at me so I asked her to calm down." (Tr. 107-108). Cope further

testified: "She is f[l]ailing her arms. She's yelling. She's screaming. She's telling us that we're only towing the car because we're racist and that we know the owner is black and that's why were towing it." (Tr. 110). The testimony we quoted above from Officer Trupp is corroborative.

{¶ 49} The jury reasonably could have believed the officers' testimony and found that they had a reasonable basis to believe that Robinson-Williams was committing the offense of disorderly conduct. The jury could have found that a reasonable officer would find that the noise she was making and her offensive and coarse language were annoying, at the very least. Moreover, given Robinson-Williams's vocal opposition to the car being towed, the jury could have found that a reasonable officer would have been alarmed about what action she might take to stop it.

{¶ 50} Focusing on a different element of the offense, Ellis contends that he did not know that Robinson-Williams was under arrest. Ellis asserts that he was parking the Durango and did not hear Officer Cope tell Robinson-Williams that she was under arrest. But Robinson-Williams testified that, after being unsuccessful in her efforts to persuade the officers not to tow the car, she turned around and said to Ellis, "'Baby, this is some racist bullshit, he's not going to talk to us. I think we should leave. There's nothing we can do.'" (Tr. 327). After saying this, she continued, one of the officers came up behind her and grabbed her arm, bending it behind her back. Both Ellis and Robinson-Williams testified that they never heard either officer say that she was under arrest. The officers, though, remembered the events quite differently. They testified that they told Robinson-Williams that she would be arrested if she did not calm down. When she did not, Officer Cope told her that she was under arrest.

Officer Trupp, too, testified that Cope told Robinson-Williams that she was under arrest:

{¶ 51} "Q: Ok, did Officer Cope ever tell her that she was under arrest at any time?

{¶ 52} "A: After he gave her a few warnings, yes he did." (Tr. 203-204).

{¶ 53} The jury reasonably could have believed the officers and inferred that Ellis heard Officer Cope tell Robinson-Williams that she was under arrest.

{¶ 54} Finally, Ellis contends that Robinson-Williams's arrest was unlawful because the officers used excessive force. As we determined above, excessive force is not an element of the offense of resisting arrest.

{¶ 55} After weighing the evidence and all reasonable inferences and finding no credibility problems with either Officer Cope or Officer Trupp, we cannot say that the jury clearly lost its way in finding Ellis guilty of interfering with the arrest of Robinson-Williams.

{¶ 56} The third assignment of error is overruled.

## IV. The Weight of the Evidence on the Charge of Resisting His Own Arrest

{¶ 57} In the fourth assignment of error, Ellis argues that the conviction for resisting his own arrest is against the manifest weight of the evidence because his arrest was rendered unlawful by Officer Cope's use of excessive force. Again, excessive force is not an element of the offense of resisting arrest.

{¶ 58} The fourth assignment of error is overruled.

## V. The Weight of the Evidence on the Charge of Obstructing Official Business

{¶ 59} In the fifth assignment of error, Ellis argues that the manifest weight of the evidence does not support the conviction for obstructing official business. The obstructing-official-business statute states: "No person, without privilege to do so and with

purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A). Before it can be said that a police officer was hampered or impeded, "there must be some substantial stoppage of the officer's progress." *State v. Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, at ¶17 (Citation omitted.). But there is no "finite period of time [that] constitutes a 'substantial stoppage.' * * * If the record demonstrates that the defendant's act hampered or impeded the officer in the performance of his duties, the evidence supports the conviction." Id. at ¶18 (Citations omitted.). Ellis contends that the evidence fails to prove either that he intended to hamper or impede the officers or that he actually did hamper or impede them. We disagree.

{¶ 60} Upon stopping a car, Officers Cope and Trupp discovered that no one in the car was licensed to drive. So they decided to have the car towed and impounded, rather than leave it in Rite-Aid's parking lot. This is not an unusual course of action for police to take in this type of situation as part of their community-caretaking function. See *South Dakota v. Opperman* (1976), 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000  (saying that, "[i]n the interests of public safety and as part of * * * [the] 'community caretaking functions,' automobiles are frequently taken into police custody"). Pertinently, Robinson-Williams testified that, after their son called and told them what was going on, she and Ellis drove to the scene, at least in part, to stop the officers from towing the car. After they arrived, Ellis and Robinson-Williams were arrested and charged.

{¶ 61} We note first that Ellis did not object to being tried jointly with

Robinson-Williams nor did he object to her testifying. That being said, based on her statement, the jury reasonably could have inferred that it was Ellis's intent to stop the officers from performing their lawful duty of towing the car. The jury also reasonably could have found that Ellis succeeded in obstructing the officers' efforts. Simply by virtue of the fact that his conduct was such that the officers had to arrest him, Ellis impeded their ability to complete their duties with respect to the initial traffic stop.

{¶ 62} The fifth assignment of error is overruled.

## VI. The Weight of the Evidence on the Affirmative Defense of Excessive Force

{¶ 63} In the sixth and final assignment of error, Ellis argues that, even if excessive force is an affirmative defense that he must prove, the weight of the evidence–specifically, the undisputed evidence that Officer Cope tazed him five times–compels finding that he did prove the defense to the charge of resisting his own arrest, as well as to the charge of interfering with the arrest of Robinson-Williams.

{¶ 64} Officer Cope testified that his first encounter with Ellis came when Ellis pulled Cope's hand off Robinson-Williams just as they finally had her under control:

{¶ 65} "Q: Alright and when Officer [Trupp] shows up are you able to get her in cuffs; get her arrested?

{¶ 66} "A: Well, almost. We were very close. We finally got her to stop twisting, got control of both hands, as I was going to go handcuff her, a gentleman came from behind again and grabbed my hand away from her telling me to, I believe the quote was, 'Get the fuck off my wife.'"   (Tr. 114-115).

{¶ 67} Officer Cope testified that Ellis broke the grip he had on Robinson-Williams

with such force that he spun him (Cope) right around. At this point, Cope said:

{¶ 68} "* * * I pointed to exactly where I wanted him to go; there was no doubt about what I wanted him to do. My preferred course of action is just to get him away from the scene so that we could finish what we're trying to do. So I pointed to the sidewalk, it seemed like that was w[h]ere he came from, like I said I didn't see him show up, I pointed to where I wanted him to go and I said, 'Get back on the sidewalk, we'll deal with you in just a minute.' And that's when he takes my hand and he pushes it down and he says, 'Get your finger out of my face.'

{¶ 69} "* * *

{¶ 70} "Q: What do you do at this point?

{¶ 71} "A: That's when I advised him, 'You're under arrest, you're interfering with our arrest here and you're under arrest.' And he says, he doesn't really say anything to me, he just gives me some expletive, I could [not] even recall exactly [what] it was, but started getting upset so I grabbed his hand just like I tried with the original suspect. Grabbed his hand and put his hand behind his back. In this case, he just rips it right out of my grasp. I mean, just rips it clean out of my grasp. And then he spins around and he squares off with me like he wants to fight me.

{¶ 72} "* * *

{¶ 73} "* * * Like he's got his fist clinched [sic], his knees are postured down and he's like in a fighting stance."   (Tr. 117-118).

{¶ 74} Officer Cope then explained that, because his attempt to control Ellis with physical force did not work, he was compelled to use the next level of force:

{¶ 75} "* * * The first level of force which is just manipulation, physical control and he resisted that he pulled away from me. So at that point I have to go up another level because I really need to keep him, ideally away from the situation where I wanted him or contained so that he can't jump on our backs again while we're trying to arrest his lady. So, I told him that he was under arrest and that he needed to comply with my orders. I pulled my tazer out, what I said, I pulled it out, turned it on, pointed it at him and said listen, 'You're under arrest, you need to put your hands behind your back right now or you're going to get tazed.' And he began to run away. So at that point, I tazered him. * * * It discharged in his right arm and he continued to run away with my tazer in his harm.

{¶ 76} "* * *

{¶ 77} "Q: Okay so when he starts running, what do you do at that point?

{¶ 78} "A: Well, I, the first time it went through it didn't appear to have any effect on him.

{¶ 79} "* * *

{¶ 80} "* * * [H]e reaches up and tries to pull one of the probes out of his arm. At that point, I tazered him again a second time to attempt to gain compliance at that point he collapsed down to the ground.

{¶ 81} "* * *

{¶ 82} "* * * At that point, I determined that he [was] going to a blue Dodge Durango * * *. It was parked [] and the driver's side door was open.

{¶ 83} "Q: And where exactly is Mr. Ellis in relation to the vehicle, is he near the bumper or?

{¶ 84} "A: Yes, he's just behind the bumper and like past the car (inaudible) behind the bumper and almost to the side of the car.

{¶ 85} "Q: * * * So describe exactly what happens when you pull the trigger on the tazer a third time.

{¶ 86} "A: Well I tazed him the second time when he grabbed ahold of it and went down. As soon as the tazer stopped clicking which means its done working, he started crawling towards that [Durango] at a hurried pace.

{¶ 87} "* * *

{¶ 88} "* * * He was crawling with his feet and his hands down, crawling and I told him to stop because I could tell he was going towards that open car and there were a lot of unknown variables in that open car door. I don't know if there's a gun in there. I don't know, I have no idea, knife, gun? I have no idea what's in that open car door, but he's definitely, frantically trying to get to that open car door. So, I told him to stop and he didn't so I tazered him one more time.

{¶ 89} "* * *

{¶ 90} "Q: What happens after you pull the trigger that time?

{¶ 91} "A: The third time, he stops and he goes down on to his back, that's right, he goes down on his back and that when I reach up, I'm close enough now to the door, I can shut the door, so I shut the door to the Durango and he's on his back. I tell him to roll over onto his abdomen and he just lies there, so I give him another order.

{¶ 92} "* * *

{¶ 93} "* * * [S]o he rolls over on to his stomach and he keeps his hands underneath

his chest so I ask him to put his hands behind his back, he doesn't, so I tazer him again and that's when we get compliance out of him, Officer Trupp shows up and we handcuff him.

{¶ 94} "Q: Ok and this last time that you use the tazer does he, why do you use the tazer at this point rather than just trying to grab his arm or his hands with your own hands?

{¶ 95} "A: Well at that point, again, I have not had a chance to pat him down, I don't know what is underneath his hands, maybe when he went down h[e] grabbed for a pistol, a knife, I have no idea, again, numerous, unknown variables. So his hands are underneath, he is showing active resistance by keeping his hands underneath his chest, the safest thing for him and for me is to do one more. The tazer appears to be effective at this point, so I tazer him one more time in lieu of trying to strike him or anything like that. * * *"   (Tr. 120-127).

{¶ 96} Ellis introduced into evidence the Dayton Police Department's written policy on tazer use. The policy limits the number of consecutive tazer discharges to three except in extreme circumstances. Officer Cope was asked about this policy on cross examination:

{¶ 97} "Q: [] [Y]ou're aware that except in extreme circumstances after three consecutive discharges you must, you will employ a different response tactic?

{¶ 98} "A: Correct.

{¶ 99} "Q: But you didn't do that in this case did you?

{¶ 100} "A: I didn't feel like it was necessary. I felt like the conditions that I had were neccessitated [sic] me using it that many times.

{¶ 101} "Q: So you deviated, you chose to deviate from the policy by which you were trained?

{¶ 102} "A: Incorrect, ma'am. It says in there that with the exception of extreme

circumstances, I felt like us battling two different people at one time was an extreme circumstance and if I were to attempt to reengage this individual it would open up the floodgates for anybody else who was in that car. I don't know what's going on with my partner at that time. I don't know that he's been over powered if she's, if he's got her in cuffs, I don't know. I don't know who else is in this Durango. I felt like the most humane and easiest thing to do for him was to continue the tazering because up from the tazer would have been a stick. I would have had to use my baton and I felt like since I was beginning to get compliance with the tazer; the tazer was the best tool for the job."   (Tr. 151-152).

{¶ 103} Finally, Officer Cope testified that the police department's internal affairs division investigated his use of force:

{¶ 104} "Q: Officer Cope are you aware of whether or not there was an internal affairs investigation done into your use of force in this case?

{¶ 105} "A: Yes.

{¶ 106} "* * *

{¶ 107} "Q: And what was the findings or what was the result of the internal affairs investigation on your use of force?

{¶ 108} "A: It was ruled a justifiable use of force." (Tr. 179).

{¶ 109} We note that Ellis testified that he did not feel the first discharge, which is consistent with Officer Cope's testimony that it did not appear to have any effect on him. So Ellis was actually tazed four, not five, times.

{¶ 110} There is little evidence supporting Ellis's claim of excessive force. The only evidence that suggests Cope used excessive force is the department's tazer-use policy. No

witness, except Ellis himself, opined that Officer Cope used excessive force. No police officer testified that Cope's actions were inappropriate under the circumstances.

{¶ 111} Given the evidence, the jury could have believed Officer Cope's testimony and reasonably could have found that the amount of force Officer Cope used was reasonable.

{¶ 112} Finally, because Ellis was not the one subjected to the alleged excessive force, he cannot assert this affirmative defense to the charge of resisting Robinson-Williams's arrest. See *State v. Davis*, Paulding App. Nos. 11-03-16, 11-03-17, 2004-Ohio-2618, at ¶21 (finding that a proposed jury instruction regarding the arresting officer's use of excessive force in arresting another person might provide that person with an affirmative defense but not the defendant).

{¶ 113} The sixth assignment of error is overruled.

### III.

{¶ 114} We have overruled each of the assignments of error presented. Therefore the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

FAIN and Brogan, JJ., concur.

(Hon. James A. Brogan, retired from the Second District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).


Copies mailed to:

John Danish / Stephanie Cook
Matthew Kortjohn
Cheryl L. Collins
Hon. John S. Pickrel