[Cite as *State v. Shoe*, 2018-Ohio-3006.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,

      CASE NO. 17-17-22

      v.

ROBERT L. SHOE,

      O P I N I O N

      DEFENDANT-APPELLANT.

---

Appeal from Sidney Municipal Court
Trial Court No. 17CRB00561

Judgment Affirmed

Date of Decision:   July 30, 2018

---

APPEARANCES:

    *Jim R. Gudgel* for Appellant

    *Jeffrey L. Amick* for Appellee

**PRESTON, J.**

{**¶1**} Defendant-appellant, Robert Shoe ("Shoe"), appeals the November 14, 2017 judgment entry of sentence of the Sidney Municipal Court. For the reasons that follow, we affirm.

{**¶2**} This case stems from a July 17, 2017 investigation by Officer Kevin Calvert ("Officer Calvert") of the Sidney Police Department of a report concerning an injured and distressed dog. After locating the dog in Shoe's backyard, Officer Calvert questioned Shoe. Eventually, Shoe became confrontational and uncooperative with Officer Calvert, cursed at Officer Calvert, and refused to provide Officer Calvert with his identification. On July 18, 2017, two complaints were filed against Shoe charging him with one count each of: obstructing official business in violation of R.C. 2921.31(A), a second-degree misdemeanor, and disorderly conduct in violation of R.C. 2917.11(A)(2), a fourth-degree misdemeanor. (Doc. Nos. 1, 2). On July 24, 2017, Shoe appeared for arraignment and entered pleas of not guilty to both counts. (*See* Doc. No. 4).

{**¶3**} A bench trial was held on September 15, 2017. (Sept. 15, 2017 Tr. at 1-3). The trial court found Shoe guilty of obstructing official business in violation of R.C. 2921.31(A) and not guilty of the disorderly-conduct charge. (Doc. No. 18); (*See* Doc. No. 22). On November 14, 2017, the trial court sentenced Shoe to 30

days in jail and two-years' probation and ordered him to pay a $150 fine. (Doc. No. 22).

{¶4} On November 17, 2017, Shoe filed a notice of appeal. (Doc. No. 26). He raises one assignment of error.

**Assignment of Error**

**The Court's verdict finding the Defendant guilty of Obstructing Official Business is not supported by the sufficiency of the evidence.**

{¶5} In his assignment of error, Shoe argues that his obstructing-official-business conviction is not supported by sufficient evidence. Specifically, Shoe argues that the State did not produce sufficient evidence to prove (1) that he acted with the purpose to prevent, obstruct, or delay a public official in the performance of the public official's duty or (2) that a public official was hampered or impeded in the performance of their duties.

{¶6} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶7} R.C. 2921.31(A) provides:

No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

To obtain a conviction for obstructing official business in violation of R.C. 2921.31(A), the State must prove that (1) the defendant acted (2) without privilege to do so and (3) with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity and that (4) the defendant's act hampered or impeded the public official (5) in the performance of the public official's lawful duties. *See State v. Pierce*, 3d Dist. Seneca No. 13-16-36, 2017-Ohio-4223, ¶ 11, quoting *State v. Dice*, 3d Dist. Marion No. 9-04-41, 2005-Ohio-2505, ¶ 19, citing R.C. 2921.31(A). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "'The purpose

with which a person does an act is determined from the manner in which it is done, the means used, and all the other facts and circumstances in evidence.'" *State v. Puterbaugh*, 142 Ohio App.3d 185, 189 (4th Dist.2001), quoting *State v. Hardin*, 16 Ohio App.3d 243, 245 (10th Dist.1984).

{¶8} At trial, the State offered the testimony of Frances Knoop ("Knoop"), one of Shoe's neighbors at the time of the incident in question. (Sept. 15, 2017 Tr. at 4). Knoop testified that, on July 17, 2017, she called the Sidney Police Department to report an injured dog in the backyard of a home that she later learned was occupied by Shoe. (*Id.* at 5). She stated that after law enforcement arrived and confronted Shoe, Shoe was "very belligerent with the officer." (*Id.* at 6). According to Knoop, Shoe was not helpful toward Officer Calvert, and he was "just standing on his porch[,] yelling at [Officer Calvert], telling him to leave," and "cursing" at him. (*Id.* at 7). She testified that Shoe and Officer Calvert's conversation lasted "for maybe 20 minutes or so." (*Id.* at 8).

{¶9} On cross-examination, Knoop testified that she was able to observe Shoe and Officer Calvert's interaction from a distance of approximately 35 to 40 feet away but she said that it may have been "a little bit further away than that." (*Id.* at 11).

{¶10} On re-direct examination, Knoop testified that there were "several instances" over the course of Shoe and Officer Calvert's interaction where Shoe used foul language and that he used the "F word" three or four times. (*Id.* at 12).

{¶11} Next, Officer Calvert testified that he was on duty on the morning of July 17, 2017 when he received a call concerning an injured dog. (*Id.* at 14). He testified that Knoop was the complainant and that when he arrived, Knoop directed him to the location of the injured dog, which turned out to be Shoe's yard. (*Id.* at 14-15). Officer Calvert testified that when he approached Shoe's backyard, he observed a gray and white pit bull "lying on its side." (*Id.* at 15). According to Officer Calvert, the dog

> wasn't moving. * * * I didn't hear any whining or anything from it. It was panting really hard. * * * It was in distress. I approached it. It never moved. It just looked at me. Its face was completely wet from panting and slobbering. There was flies and gnats that were flying all over the animal, and it was just laying there defenseless.

(*Id.* at 15-16). Officer Calvert testified that he then knocked on the back door of the residence in an attempt to see whether the resident "knew anything about the dog." (*Id.* at 16).

{¶12} Officer Calvert testified that although he did not initially get a response when he knocked on the back door, Shoe eventually emerged from the

residence. (*Id.* at 17). Officer Calvert proceeded to ask Shoe whether he knew anything about the dog. (*Id.* at 18). Officer Calvert testified that Shoe explained to him "that the dog was hit last night * * * by a car. [Shoe] said that it was whining in the house, and he wasn't able to sleep so he took the dog out and laid it in the grass." (*Id.*). After Shoe explained why the dog was in the backyard, Officer Calvert asked Shoe for his identification to issue Shoe a citation for animal cruelty. (*Id.* at 19).

{¶13} Once Officer Calvert told Shoe that he intended to cite Shoe for animal cruelty, Shoe became belligerent and uncooperative. (*Id.* at 19-20). According to Officer Calvert, Shoe said, "Fuck you, dumb fucker. * * * You're trespassing. Get the fuck off my property." (*Id.*). Officer Calvert told Shoe that he was "going to be arrested if [he] continue[d] to use the profanities." (*Id.* at 20). Officer Calvert testified that at that point, "[Shoe went] in the house, [and] apparently call[ed] the police to get me removed." (*Id.*). When Shoe went into his residence, Officer Calvert also "called for a backup unit because [Shoe] was really loud, yelling, [and] telling [him] to get the fuck off his property." (*Id.*).

{¶14} Officer Calvert testified that after a "minute or two" in his residence, Shoe eventually reemerged when another law enforcement officer arrived. (*Id.*). He stated that, on returning outside, Shoe told the other law enforcement officer to "get that piece of shit off my property," referring to Officer Calvert. (*Id.*). During

this entire exchange, Shoe had yet to provide Officer Calvert with his identification. (*Id.* at 21).

{¶15} Officer Calvert testified that it "might have been 30, 35, 40 minutes" from the time he first engaged with Shoe until the interaction ended. (*Id.* at 21-22). He stated that had Shoe simply gone into his residence and retrieved his identification as requested, the interaction would not have lasted as long as it did. (*Id.* at 22). Officer Calvert testified that due to Shoe's conduct and delay in furnishing him with identification, he was not able to perform his job as quickly as he would otherwise have been able. (*Id.* at 23). He testified that the animal-cruelty investigation was eventually turned over to the Shelby County dog warden. (*Id.* at 25).

{¶16} On cross-examination, Officer Calvert stated that Shoe "had went back into his house several times while we were there" but admitted that he "forgot" to put that detail in his initial police report. (*Id.* at 27, 29). He insisted that Shoe went "into his house two times" during their interaction although his report reflects only that Shoe "went to his residence and returned with his identification." (*Id.* at 28-29).

{¶17} On re-direct examination, Officer Calvert clarified his testimony as to Shoe's movements on the day of the incident. He testified:

> To my recollection he went into his house two times and shut the door. Once prior to [the other law enforcement officer] arriving and then after [that officer] arrived, he went back into his house. And when I was talking to [the other law enforcement officer], he came back out and gave the ID to [the other officer], not me, and it was handed over to me.

(*Id.* at 30-31). Officer Calvert stated that Shoe went back into his residence once prior to retrieving his identification and that the second time he went into his residence, he was inside for a minute or two before returning with his identification. (*Id.* at 29-30). He further testified that he "called for backup immediately when [Shoe] started to raise his voice telling [him] to get off his property" and that had Shoe not acted in that manner, he would not have called for assistance. (*Id.* at 31).

{¶18} The trial court examined Officer Calvert. When asked about the time that elapsed from the moment Shoe was first asked to produce identification until Shoe finally provided his identification, Officer Calvert testified that it was "[p]robably ten minutes." (*Id.* at 33). Officer Calvert summarized the interaction as follows:

> I asked him for his ID. He got very aggressive, loud, using profane language, telling me to get off his property. I was explaining why I was there. I was there investigating an incident. I had a legal right to

be there. He [said] "F you". You've got to get off my property. So

it was a communication between us and then he went back inside.

(*Id.* at 34). He testified that the initial conversation between him and Shoe lasted for a few minutes before Shoe first went inside and shut the door. (*Id.* at 34-35). Shoe remained in his residence for some time until the other law enforcement officer arrived. (*Id.* at 35). At that point, Shoe came back outside where he was once again "abusive" with Officer Calvert. (*Id.*). Shoe then went inside again, came out with his identification, and gave the other law enforcement officer his identification which that officer then gave to Officer Calvert. (*Id.*).

{¶19} In the present case, Shoe does not contest that Officer Calvert was performing an authorized act within his official capacity at the time of the incident, and he does not assert a claim of privilege. Thus, we presume that Officer Calvert was acting in the performance of his lawful duty and that Shoe was not privileged to conduct himself as he did. *See State v. Brickner-Latham*, 3d Dist. Seneca No. 13-05-26, 2006-Ohio-609, ¶ 28. As such, we will review only whether the State presented sufficient evidence to prove that there was (1) an act by Shoe (2) done with the purpose to prevent, obstruct, or delay Officer Calvert (3) that hampered or impeded Officer Calvert's performance of his lawful duty. *See State v. Cobb*, 2d Dist. Montgomery No. 19474, 2003-Ohio-3034, ¶ 8, fn. 1.

**{¶20}** We conclude that Shoe's obstructing-official-business conviction is supported by sufficient evidence. First, the State presented sufficient evidence to support a finding that Shoe engaged in an "act." "'Ohio courts have consistently held that in order to violate the obstructing official business statute a defendant must engage in some affirmative or overt act * * *.'" *Pierce*, 2017-Ohio-4223, at ¶ 12, quoting *State v. Crowell*, 189 Ohio App.3d 468, 2010-Ohio-4917, ¶ 11 (2d Dist.), quoting *State v. Harrell*, 2d Dist. Montgomery No. 21736, 2007-Ohio-4550, ¶ 12. "A mere failure or refusal to respond to an officer's request does not constitute obstructing official business." *Crowell* at ¶ 11, citing *Harrell* at ¶ 12, citing *State v. Christman*, 2d Dist. Montgomery No. 19039, 2002-Ohio-2915; *Brickner-Latham* at ¶ 26 (noting that "the refusal to produce identification upon request by a police officer will not support a finding of obstructing official business"), citing *State v. McCrone*, 63 Ohio App.3d 831, 835 (9th Dist.1989). However, failure to respond to a law enforcement officer's request, such as a request for identification, coupled with "loud, boisterous, and uncooperative conduct" or a retreat from law enforcement officers into a house or other building may constitute an affirmative or overt act for purposes of R.C. 2921.31(A). *See Pierce* at ¶ 13 (determining that Pierce "moved into the realm of affirmative action when he decided to flee into the house in the midst of a police investigation and attempted to close the door on the officers"); *State v. Florence*, 12th Dist. Butler No. CA2013-08-148, 2014-Ohio-

2337, ¶ 12-13 ("[A] defendant's volume and demeanor making it impossible to investigate a complaint has been found sufficient to constitute an act for an obstructing official business conviction."), citing *City of Warren v. Lucas*, 11th Dist. Trumbull No. 99-T-0019, 2000 WL 655446 (May 19, 2000).

**{¶21}** Here, any rational trier of fact could find beyond a reasonable doubt that Shoe engaged in an affirmative or overt act. Officer Calvert testified that as soon as Shoe was asked for his identification and informed that he was going to be cited for animal cruelty, Shoe became belligerent, profane, and uncooperative. Shoe's choice to adopt an antagonistic demeanor with Officer Calvert constitutes an affirmative act. *State v. Parkhurst*, 11th Dist. Trumbull No. 2015-T-0041, 2016-Ohio-1018, ¶ 31 ("Parkhurst's argumentativeness constituted an affirmative act that, according to the testimony of Patrolman Hodge, did delay him from issuing the citation."); *State v. Willey*, 5th Dist. Stark No. 2014CA00222, 2015-Ohio-4572, ¶ 24 ("[Willey] did not physically resist police in the instant case but her argumentative demeanor needlessly escalated the entire incident and entirely stalled the investigation into the original complaint."); *Florence* at ¶ 12-13 ("Florence's purposeful loud, boisterous, and uncooperative conduct made the performance of [the deputies'] duties more difficult."). Moreover, after being informed that Officer Calvert intended to issue him a citation, Shoe withdrew into his home, depriving Officer Calvert of the ability to ask Shoe additional questions pertinent to his

animal-cruelty investigation and further press Shoe to provide identification. Although Shoe returned outside once the other law enforcement officer arrived, Shoe failed to bring identification with him, and he still did not provide Officer Calvert his name. Only after going back into his residence again for a couple minutes did Shoe reemerge and provide Officer Calvert with his identification. Shoe's repeated trips into his residence and away from Officer Calvert's investigation, which had the effect of delaying Officer Calvert from finding out Shoe's identity, also constitute an affirmative act. *See Pierce* at ¶ 13-14; *State v. Harris*, 9th Dist. Summit No. 27639, 2015-Ohio-5378, ¶ 8 (concluding that "Mr. Harris's retreat into his house after being ordered by Deputy Breedan to put his hands on top of his head and to talk with him constituted an overt act that was sufficient to support his conviction for obstructing official business."). *See also Brickner-Latham* at ¶ 27 (recognizing that "where an individual 'also takes affirmative actions to hamper or impede the police from finding out his or her identity, the defendant may be guilty of obstructing official business'"), quoting *State v. Justice*, 4th Dist. Pike No. 99CA631, 1999 WL 1125113, *5 (Nov. 16, 1999). In sum, Shoe's decision to twice remove himself from the scene of Officer Calvert's investigation before identifying himself and his decision to employ crude and disruptive language with Officer Calvert are sufficient to satisfy the affirmative act requirement of R.C. 2921.31(A). *See Pierce* at ¶ 14; *Harris* at ¶ 8; *Florence* at

¶ 11-13; *Dayton v. Turic*, 2d Dist. Montgomery No. 20149, 2005-Ohio-131, ¶ 26;

*In re Sommer*, 5th Dist. Stark No. 2004CA00074, 2004-Ohio-5885, ¶ 12.

{¶22} In addition, a rational trier of fact, evaluating the manner of Shoe's conduct and all other facts and circumstances, could find that it was Shoe's specific intention to prevent, obstruct, or delay Officer Calvert's investigation. Pairing Shoe's belligerence, profanity, uncooperativeness, and repeated demands that Officer Calvert "[g]et the fuck off" his property with his persistent failure to provide identification, a rational trier of fact could infer that it was Shoe's specific intent to obstruct Officer Calvert's investigation by rendering him incapable of asking further questions or to delay the issuance of a citation for animal cruelty. *See State v. Street*, 2d Dist. Montgomery No. 26501, 2015-Ohio-2789, ¶ 20-23 (suggesting that a trier of fact could find that Street purposely hampered or impeded a police officer based on Street's "refus[al] to provide [the police officer] with his personal information as requested," "yelling, cursing, and interrupting [the police officer]" instead of answering questions, and "talk[ing] over the other officers and curs[ing] at them, which prevented the officers from calming down the situation"); *State v. Burns*, 2d Dist. Montgomery No. 22674, 2010-Ohio-2831, ¶ 7, 26 (sustaining a jury's inference of a purpose to delay or obstruct a police investigation based on Burns's "behavior of yelling and screaming" including "using foul language and demanding that [the police officer] leave" and "call[ing] 911 and demand[ing] the presence of

a supervisor"); *State v. Sims*, 2d Dist. Montgomery No. 22528, 2008-Ohio-6242, ¶ 20 (suggesting that a purpose to prevent, obstruct, or delay can be inferred from the duration of an encounter between a law enforcement officer and a defendant, a defendant's profanity and screaming, and a defendant's refusal to comply with a law enforcement officer's orders); *N. Ridgeville v. Elliott*, 9th Dist. Lorain Nos. 05CA008686 and 05CA008687, 2006-Ohio-3332, ¶ 3, 9-12. Furthermore, Shoe's multiple trips into his residence during the course of Officer Calvert's investigation support an inference that Shoe intended to obstruct Officer Calvert's investigation and delay the issuance of a citation for animal cruelty for as long as possible. *See Pierce* at ¶ 15 (noting that Pierce's actions demonstrated an intent to hamper or impede, in part, because Pierce "'darted' into [a] house and attempted to shut the front door"). Although Shoe argues that he went into his residence not for the purpose of any delay but to call for additional law enforcement assistance because he did not agree with Officer Calvert's presence on his property, his argument is undermined by the fact that, rather than returning to the scene of Officer Calvert's investigation as quickly as possible to submit to possible further questioning, Shoe remained in his residence until the other law enforcement officer arrived. Additionally, while Shoe had an opportunity to retrieve his identification the first time he went into his residence, he did not bring it with him when he returned to meet the other officer; instead, Shoe had to go back into his residence yet again to

retrieve his identification, sequestering Shoe from the investigation and further delaying Officer Calvert from learning Shoe's identity. As such, we conclude that a rational trier of fact could infer that Shoe purposely acted to prevent, obstruct, or delay Officer Calvert from performing an authorized act within the scope of Officer Calvert's official capacity.

{¶23} Finally, the State presented sufficient evidence from which any rational trier of fact could find beyond a reasonable doubt that Shoe's conduct hampered or impeded Officer Calvert in the performance of his duties. "The proper focus in a prosecution for obstructing official business is on the defendant's conduct, verbal or physical, and its effect on the public official's ability to perform the official's lawful duties." *State v. Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, ¶ 12 (1st Dist.). "[I]n order to be convicted for obstructing official business, there must be evidence presented indicating the defendant * * * interfered with the performance of an official duty, thereby making the performance of that duty more difficult." *State v. Ertel*, 12th Dist. Warren No. CA2015-12-109, 2016-Ohio-2682, ¶ 8, citing *State v. Standifer*, 12th Dist. Warren No. CA2011-07-071, 2012-Ohio-3132, ¶ 28, citing *State v. Whitt*, 12th Dist. Butler No. CA89-06-091, 1990 WL 82592, *2 (June 18, 1990). *See State v. Ellis*, 2d Dist. Montgomery No. 24003, 2011-Ohio-2967, ¶ 59 (noting that to "hamper or impede" a law enforcement officer, "'there must be some substantial stoppage of the officer's progress'" but

that there is no "'finite period of time [that] constitutes a "substantial stoppage"'"), quoting *Wellman* at ¶ 17-18.

**{¶24}** Here, Officer Calvert testified to a delay of approximately ten minutes from the time he first requested that Shoe produce his identification until Shoe provided his identification. Officer Calvert estimated that the entire episode took between 30 and 40 minutes and that, but for Shoe's conduct, he would have been able to conclude his investigation sooner. Knoop's testimony supports Officer Calvert's assertion as to the duration of the encounter. According to Officer Calvert, Shoe's actions rendered it impossible for him to perform his job as quickly as he would otherwise have been able. The delay occasioned by Shoe's conduct made it more difficult for Officer Calvert to continue his animal-cruelty investigation and to determine whether to issue Shoe a citation. *See State v. Shoemaker*, 1st Dist. Hamilton No. C-140724, 2015-Ohio-4645, ¶ 15, 19 (finding that a five-minute delay in an investigation of a hit-skip collision hampered or impeded a law enforcement officer's performance of his duties); *Wellman* at ¶ 18-19 (suggesting that a delay of "approximately two to five minutes" can constitute hampering or impeding). Thus, we conclude that the State presented sufficient evidence that Shoe hampered or impeded a public official in the performance of his lawful duties.

**{¶25}** Therefore, viewing the evidence presented in a light most favorable to the prosecution, a rational trier of fact could have found that Shoe acted with the

purpose to prevent, obstruct, or delay Officer Calvert's performance of an authorized act within his official capacity and that Officer Calvert was hampered or impeded in the performance of his lawful duties. Accordingly, we conclude that Shoe's obstructing-official-business conviction is supported by sufficient evidence.

{¶26} Shoe's assignment of error is overruled.

{¶27} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**