[Cite as *State v. Armstrong-Carter*, 2021-Ohio-1110.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case Nos. 28571 and 28576 |
| | : | |
| v. | : | Trial Court Case Nos. 2019-CRB-908 |
| | : | and 2019-TRD-1423 |
| JEWELL ARMSTRONG-CARTER | : | |
| | : | (Criminal Appeal from Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of April, 2021.

. . . . . . . . . . .

LINDSAY E. BOZANICH, Atty. Reg. No. 0097356, Assistant Prosecuting Attorney, City of Dayton Prosecutor's Office, 335 West Third Street, Room 372, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

CARLO C. MCGINNIS, Atty. Reg. No. 0019540, 55 Park Avenue, Dayton, Ohio 45419
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Defendant-appellant, Jewell Armstrong-Carter, appeals from his conviction in the Dayton Municipal Court after a jury found him guilty of failure to comply with the order or signal of a police officer, resisting arrest, and obstruction of official business. In support of his appeal, Armstrong-Carter argues that the jury instruction given for resisting arrest provided the wrong burden of proof for the affirmative defense of excessive force. Armstrong-Carter also argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Armstrong-Carter additionally challenges the trial court's appointment of an acting judge for his trial and alleges several instances of prosecutorial misconduct. Lastly, Armstrong-Carter claims that the cumulative effect of all the errors in this case deprived him of a fair trial and warrants a reversal of his conviction. For the reasons outlined below, Armstrong-Carter's arguments lack merit, and his judgment of conviction will be affirmed.

## Facts and Course of Proceedings

**{¶ 2}** On February 27, 2019, Armstrong-Carter was charged in Case No. 2019-CRB-908 with failure to comply with the order or signal of a police officer in violation of R.C. 2921.331(A), resisting arrest in violation of R.C. 2921.33(A), and obstruction of official business in violation of R.C. 2921.31(A). In a related traffic case, Case No. 2019-TRD-1423, Armstrong-Carter was also charged with operating a vehicle without a valid license, driving while under suspension, driving while under a financial responsibility law suspension, operating a vehicle without license plates, failure to reinstate a license, and a window tint violation. The charges in both cases arose from a traffic stop of a vehicle driven by Armstrong-Carter on February 26, 2019. Although Armstrong-Carter filed

notices of appeal in both cases, the issues raised on appeal only pertain to the criminal charges brought against him in Case No. 2019-CRB-908.   Therefore, our discussion will be limited to those charges.

{¶ 3} Armstrong-Carter pled not guilty to the aforementioned criminal charges and the matter was scheduled for a jury trial.   Due to the absence of the Dayton Municipal Court judge assigned to Armstrong-Carter's case, the presiding judge of the municipal court appointed Colette E. Moorman as an acting judge for Armstrong-Carter's trial. Armstrong-Carter objected to Moorman's appointment on grounds that there were active Dayton Municipal Court judges available to preside over his trial.   However, in the entry appointing Moorman as acting judge, the presiding judge found that "the other judges of the Court are not available on the [dates of trial] due to scheduled cases or other Court business," and thus overruled Armstrong-Carter's objection.   The matter then proceeded to trial before Judge Moorman.

{¶ 4} At trial, the State presented testimony from the Dayton police officers who encountered Armstrong-Carter on the day in question.   The State also presented video footage taken from the officers' cruiser camera.   The testimony and evidence established that on February 26, 2019, Officers Cody Hartings and Vince Carter were on patrol as a two-man crew in their police cruiser when they spotted a black Chevy Monte Carlo with dark window tint and no license plates traveling on Stewart Street in Dayton, Ohio.   After observing these traffic infractions, the officers activated their lights and siren while on Danner Avenue for purposes of initiating a traffic stop of the vehicle.   The officers testified, and the video evidence confirmed, that although there were several places for the vehicle to stop, the vehicle nevertheless continued to travel down Danner Avenue

without slowing down. The video showed that after approximately 25 seconds, the vehicle eventually stopped after pulling into a parking lot of an apartment complex. Once the vehicle stopped, the officers blocked the vehicle with their cruiser and prevented the vehicle from reversing into a parking spot.

{¶ 5} The officers testified that they had concerns about approaching the vehicle because they could not see inside the vehicle due to its dark window tint and because they did not know why the driver did not timely stop after they activated their lights and siren. Despite these concerns, the record indicates that Off. Hartings approached the driver's side of the vehicle while Off. Carter approached the passenger's side. Off. Hartings then tapped on the driver-side window. The driver, later identified as Armstrong-Carter, did not respond to the tapping. After six seconds, Off. Hartings attempted to open the driver-side door, but it was locked. Off. Hartings then tapped on window again and said: "Roll down your window. Roll down your window. I can't see you. Roll down your window." Off. Hartings then tried to open the door again and it was still locked. Off. Hartings then tapped on the window again and said: "Give me your ID." In response, Armstrong-Carter said something indiscernible, and Off. Hartings replied: "Cause you don't have a license plate."

{¶ 6} At this point, the record indicates that Armstrong-Carter partially opened the driver-side window. Armstrong-Carter then made some undiscernible comments and told Off. Hartings to: "Talk to Todd." In response, Off. Hartings said: "Who is Todd?— Ok, you have to give me your ID." However, instead of giving Off. Hartings his identification, Armstrong-Carter made some more indiscernible comments and said: "You don't have to tap this window either." After this brief conversation, Off. Hartings testified

that Armstrong-Carter rolled his window back up. In response, Off. Hartings told Armstrong-Carter: "You want your window broke? Give me your ID." Off. Hartings then continued tapping on the driver-side window and once again said: "Give me your ID."

{¶ 7} Shortly thereafter, the video shows that Off. Hartings made a quick movement toward the vehicle and said: "Get out the car." Off. Hartings testified that in that moment, he attempted grab Armstrong-Carter through the driver-side window, but failed. After the failed attempt at grabbing Armstrong-Carter, Off. Hartings asked Off. Carter: "Do you have your window puncher on you?" Off. Hartings then continued to knock on the window and once again told Armstrong-Carter to: "Give me your ID."

{¶ 8} During this time, a man, later identified as Todd Zachary, can be seen on the video evidence emerging from a nearby vehicle. Zachary approached the officers with some papers in his hand and yelled for Armstrong-Carter to: "Open the door up man!" Zachary also shouted: "Open up the door bro!—Man we driving a car with no tags man!" Zachary, a defense witness, testified that Armstrong-Carter was like a nephew to him. Zachary testified that on the day in question, he and Armstrong-Carter were in the process of selling the Monte Carlo that Armstrong-Carter was driving. Zachary also testified that he had been driving behind Armstrong-Carter for purposes of taking the vehicle to be sold. Zachary further testified that he approached the officers to try and show them the title to the vehicle, and that he wanted to help get Armstrong-Carter out of the vehicle so that the officers would not break the vehicle's windows.

{¶ 9} Shortly after Zachary arrived at the scene, Off. Carter was able to open the vehicle's passenger-side door. Off. Carter then looked in the vehicle and said: "You're about to get snatched up. Unlock the door. You're gonna get snatched up." To this,

Armstrong-Carter made some more indiscernible comments and yelled: "For what?" Off. Carter then said: "Unlock the door." At this point, the record indicates that the driver-side door unlocked and Off. Hartings opened the door. Off. Hartings then immediately grabbed Armstrong-Carter from the vehicle and wrestled him toward the back of the vehicle. Off. Carter then assisted Off. Hartings and the two officers wrestled Armstrong-Carter to the ground.

{¶ 10} As the officers wrestled Armstrong-Carter to the ground, Armstrong-Carter said: "You fucked up bro." While the officers had Armstrong-Carter on the ground, one of the officers ordered Armstrong-Carter to: "Give me your hands, give me your hands." During this time, Armstrong-Carter continued to make comments to the officers. For instance, Armstrong-Carter said: "You got me fucked up," and "I didn't do a motherfucking thing," and "I didn't do shit bro." Although a lot of the comments on the video are indiscernible, both Off. Hartings and Off. Carter testified that Armstrong-Carter cursed at them and told them that they were going to have to "work for it." Trial Trans. p. 205 and 364.

{¶ 11} The officers testified that when Armstrong-Carter was on the ground, he had his arms beneath his stomach and chest area so that they could not place him in handcuffs. Both officers also testified that they tried to grab Armstrong-Carter's arms from underneath him. During the struggle, the video shows that Off. Carter made a jerking motion with his arm. Off. Carter testified that the jerking motion was him drawing out his retractable asp. Off. Carter testified that he never hit Armstrong-Carter with the asp, but simply used it as a lever in an attempt to pry Armstrong-Carter's arms out from underneath him. Off. Hartings, however, applied four to five closed-fist strikes to

Armstrong-Carter's face. Off. Hartings testified that he did not hit Armstrong-Carter as hard as he could. Off. Hartings also testified that the strikes to the face were a means of pain compliance because he was concerned about Armstrong-Carter having access to his waistband.

{¶ 12} As the two officers continued their struggle to handcuff Armstrong-Carter, a third officer, Mark Orick arrived at the scene. The video evidence showed that Off. Orick told bystanders to back up before he went over to assist Off. Hartings and Off. Carter handcuff Armstrong-Carter. During this time, the officers repeatedly told Armstrong-Carter to: "Put your hands behind your back." Although it was not captured on the video, Off. Orick testified to striking Armstrong-Carter twice in the forehead with a closed fist. Like Off. Hartings, Off. Orick testified that he did not use all his force when striking Armstrong-Carter and was not trying to knock him out or injure him. Off. Orick testified that he was concerned Armstrong-Carter might have a weapon in his waistband since Armstrong-Carter's arm was not within view and since Armstrong-Carter would not produce his arm.

{¶ 13} Shortly thereafter, the video evidence established that Off. Hartings delivered nine knee strikes to Armstrong-Carter's body. Off. Hartings testified that the knee strikes were applied to Armstrong-Carter's rib cage area for purposes of pain compliance. A short time after the knee strikes, Armstrong-Carter started screaming: "I can't breathe!" Armstrong-Carter screamed this phrase loudly and repeatedly for approximately 25 seconds. Off. Hartings testified that he was doing nothing to restrict Armstrong-Carter's airflow at the time Armstrong-Carter was screaming that he could not breathe. Off. Hartings also testified that he was not concerned about Armstrong-Carter's

breathing because of how he was able to scream.

{¶ 14} Once the officers were able to get the handcuffs on Armstrong-Carter, the video evidence established that Armstrong-Carter stopped screaming and went silent. All three arresting officers testified that Armstrong-Carter began flopping and seizing immediately after he was handcuffed. Off. Hartings and Off. Zachary Banks, who also assisted at the scene, testified that in the midst of seizing, Armstrong-Carter looked up at them, smiled, and said "gotcha bitch." Trial Trans. p. 265 and 370. After Armstrong-Carter finished flopping/seizing, the officers placed him up against the hood of Off. Hasting's and Off. Carter's cruiser in order to search him. During this time, the video showed that Armstrong-Carter was conscious and exchanging comments with the officers. Off. Hartings and Off. Banks then escorted Armstrong-Carter to the backseat of Off. Hartings's cruiser.

{¶ 15} Off. Hartings and Off. Banks testified that, as they escorted Armstrong-Carter to the backseat of the cruiser, Armstrong-Carter went limp and would not stand on his own volition. The officers also testified that Armstrong-Carter would take a few normal steps and then use all of his force to dive forward while the officers were trying to hold him up by his arms. The officers further testified that Armstrong-Carter resisted getting into the backseat of the cruiser by stiffening his feet and kicking/putting his feet in the door. The backseat cruiser camera video also showed that Armstrong-Carter resisted as the officers tried to place him inside the cruiser. Banks testified that it took at least four officers to get Armstrong-Carter in the backseat of the cruiser.

{¶ 16} Due to Armstrong-Carter's apparent seizure, the officers called Dayton Fire Department Medic Kyle Crofford to evaluate Armstrong-Carter. Crofford testified that he

evaluated Armstrong-Carter in the backseat of a police cruiser and saw no obvious injury to Armstrong-Carter. With regard to seizures, Crofford testified that he often had contact with people seizing and had been trained on seizures. Crofford testified that when a person has a violent shaking-type seizure, known as a tonic clonic or grand mal seizure, the person loses all cognitive ability to think and understand what is going on. Crofford further testified that five to thirty minutes after such a seizure a person will typically be disoriented and have no memory of what happened prior to the seizure.

{¶ 17} Crofford testified, and the video evidence confirmed, that Armstrong-Carter was able to respond to Crofford's questions appropriately, form sentences correctly, and discuss how he had been apprehended by police officers. Crofford testified that although Armstrong-Carter told him that he was confused and unsure about what was going on, Armstrong-Carter nevertheless had an understanding of what happened during the seizure. The video and Crofford's testimony also indicated that Armstrong-Carter claimed to have a history of seizures, yet he did not know the name of his seizure medication. Crofford testified that, in his experience, someone with a history of tonic clonic/grand mal seizures would know the name of their medication.

{¶ 18} After Armstrong-Carter was evaluated by Crofford, Off. Hartings and Off. Carter transported Armstrong-Carter to Grandview Hospital. Although there were no obvious signs of physical injury to Armstrong-Carter, Off. Hartings testified that due to jail protocol, Armstrong-Carter could not be booked into jail until he was evaluated at the hospital. During the trip to the hospital, the cruiser camera video captured Armstrong-Carter spewing a bevy of insults and profanity at Off. Hartings. Armstrong-Carter told Off. Hartings: "You weak as fuck. Weak. You couldn't even get my one fucking arm

behind my back. You a bitch." Armstrong-Carter also said: "You can't even arrest a mother fucker." Armstrong-Carter additionally stated: "You had to push me in y'all cruiser. You couldn't even put the fucking cuffs on my back and I was having a seizure." Armstrong-Carter made further comments about his head being stomped and being hit in the head with a baton, claims which Off. Hartings and Off. Carter testified were not true.

{¶ 19} To document Armstrong-Carter's physical condition, the officers photographed Armstrong-Carter before he received treatment at the hospital and after he was released from the hospital. The photographs were admitted into evidence and show no obvious injury to Armstrong-Carter, except for a small lump on the side of his forehead.

{¶ 20} The State also presented testimony from Dayton Police Detective Mike Fuller. Det. Fuller testified that he had trained officers at the police academy for 12 years on the subject of use of force and defense tactics. Det. Fuller testified that he did not know Off. Hartings or Off. Carter personally, but that he had trained both of them at the police academy.

{¶ 21} Det. Fuller testified that a "use of force continuum" is used to instruct officers on the kinds of force they are permitted to use when arresting a resistant person. Det. Fuller explained that the use of force continuum is a matrix which provides appropriate responses for certain behavior. For example, Det. Fuller testified that the matrix shows that appropriate responses for passive resistance (such as pulling away from an officer or refusing to move) include takedowns with balance displacement, joint manipulation, and striking large muscle groups. When a subject wrestles with an officer, Det. Fuller testified that the appropriate responses include hand strikes, knee strikes, and using pepper spray, a Taser, or an asp. Det. Fuller also generally testified that that striking,

punching, kicking, takedowns, and joint manipulations are all responses on the force continuum that are taught to officers in training.

{¶ 22} Det. Fuller testified that in addition to the force continuum, officers in training are taught to consider factors such as the person's size, age, sex, and skill level. Det. Fuller testified that officers are also taught to consider the environment and other special circumstances such as the closeness of a weapon, injury, and exhaustion. Det. Fuller further testified to teaching about safety risks. As an example, Det. Fuller testified that when a subject is lying face down on the ground and "turtles" their arms underneath them, such a position can provide them access to areas where guns are often hidden, such as a waistband or pocket. Det. Fuller additionally discussed safety concerns with a subject being inside a vehicle, noting that a vehicle can be used as a weapon.

{¶ 23} After presenting the foregoing testimony and evidence, the State rested its case. The defense then presented testimony from Armstrong's "uncle," Todd Zachary. Zachary testified that when he approached the officers he could see inside the vehicle and observed Armstrong-Carter with his identification ready in his hand. Zachary also testified that he had no idea why Armstrong-Carter did not get out of the vehicle. Zachary further testified that after the incident, he observed bruises on Armstrong-Carter's chest and back that were the size of his hand.

{¶ 24} The defense also presented testimony from a bystander at the scene named Quinshayla Kelley. Kelley testified that she recorded a portion of the incident on her cell phone camera. The cell phone recording was admitted into evidence and it showed the incident from a different angle. In Kelley's cell phone recording, Armstrong-Carter can be seen lying stomach down on the ground with Off. Hartings and Off. Carter

on top of him. Off. Carter was retracting his asp and pulling Armstrong-Carter's right arm behind him. The video then showed Armstrong-Carter removing his left arm from underneath him and away from Off. Hartings. Off. Hartings then proceeded to strike Armstrong-Carter twice in the head. Armstrong-Carter then fought with Off. Hartings for control of his left arm.

{¶ 25} The video then showed Off. Orick jumping in the fray to help the other officers. Off. Hartings can also been seen striking Armstrong-Carter with his hand again and applying nine knee strikes to Armstrong-Carter's torso. Several officers then rush around Armstrong-Carter and the other officers. Thereafter, Armstrong-Carter's body can be seen flopping/seizing on the pavement while he is handcuffed.

{¶ 26} Following Zachary and Kelley's testimony and the admission of the cell phone recording, the defense rested its case. The jury then deliberated and found Armstrong-Carter guilty as charged. At sentencing, the trial court imposed 180 days in jail with two days suspended, a $100 fine, and a one-year license suspension for failure to comply with the order or signal of a police officer. For resisting arrest and obstructing official business, the trial court imposed 90 days in jail with two days of credit for each offense. The trial court did not discuss whether the sentences were to be served concurrently or consecutively with each other nor did the court make any finding as to whether any of the offenses should merge as allied offenses of similar import. The trial court simply ordered the sentences to run concurrently with the sentence imposed in Case No. 2019-TRD-1423.

{¶ 27} Armstrong-Carter now appeals from his conviction, raising five assignments of error for review.

**First Assignment of Error**

{¶ 28} Under his first assignment of error, Armstrong-Carter challenges the trial court's jury instruction on resisting arrest. Specifically, Armstrong-Carter contends that the trial court erroneously instructed the jury that he had the burden to prove the affirmative defense of excessive force by the arresting officers. In support of this claim, Armstrong-Carter asserts that excessive force should not be considered as an affirmative defense. Rather, Armstrong-Carter claims that excessive force should be considered under the "lawful arrest" element of resisting arrest, which the State is required to prove at trial. We disagree.

{¶ 29} As a preliminary matter, we note that Armstrong-Carter submitted proposed jury instructions that specifically requested the jury instruction he is now challenging on appeal. With regard to resisting arrest, Armstrong-Carter requested "the jury instructions listed in Ohio Jury Instructions [OJI] CR 521.33" and "the instruction regarding the Affirmative Defense, excessive force listed in [OJI]." Proposed Jury Instructions (Sep. 20, 2019). The requested language is the same language that was used in the instructions provided to the jury. *See* Court's Charge to Jury (Sept. 27, 2019); Ohio Jury Instructions, 2 CR Sections 521.33 and 417.27.

{¶ 30} The Supreme Court of Ohio has held that when a defendant's proposed jury instructions contain the language that the defendant later claims is erroneous, "the defense invited any error and may not ' "take advantage of an error which he himself invited or induced." ' " *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 145, quoting *State v. Bey*, 85 Ohio St.3d 487, 493, 709 N.E.2d 484 (1999), quoting

*Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. Therefore, because Armstrong-Carter requested the resisting arrest/excessive force jury instruction that was given by the trial court, he may not now challenge that instruction on appeal.

{¶ 31} However, even if Armstrong-Carter could challenge the instruction at issue, this court has already rejected Armstrong-Carter's argument in *State v. Ellis*, 2d Dist. Montgomery No. 24003, 2011-Ohio-2967. As previously noted, Armstrong-Carter asserts that excessive force is not an affirmative defense, but part of the "lawful arrest" element of resisting arrest that the State is required to prove at trial. In *Ellis*, we held that that "excessive force is not an element of resisting arrest" and that "placing the burden on the defendant to prove excessive force is proper." *Id.* at ¶ 24 and ¶ 27. In so holding, we explained that:

> Excessive force is not an element of resisting arrest. Undoubtedly, " '[a] lawful arrest is an essential element of the crime of resisting arrest,' " which the state must prove. [*State v. Burns*, 2d Dist. Montgomery No. 22674, 2010-Ohio-2831, ¶ 29, quoting *State v. Vactor*, 9th Dist. Lorain No. 02CA008068, 2003-Ohio-7195, ¶ 34.] But "lawful arrest," in this context, refers only to the underlying reason for the arrest: "In order to prove a lawful arrest, * * * the State must prove both 'that there was a reasonable basis to believe that an offense was committed, [and] that the offense was one for which the defendant could be lawfully arrested.' " *Burns*, at ¶ 29, quoting *Vactor*, at ¶ 34. * * * "The use of excessive force may give rise to civil remedies or criminal defenses," * * * "but it does not negate the legal nature

of an accused's detention for Fourth Amendment or concurrent statutory purposes." [*State v. Thompson,* 4th Dist. Ross No. 92CA1906, 1993 WL 472907, *4 (Nov. 9, 1993)]. * * * " ' [T]he absence of excessive or unnecessary force is not a material element of the crime of resisting arrest as defined in R.C. 2921.33.' " [*Blanchester v. Newland,* 12th Dist. Clinton No. CA83-07-008, 1984 WL 3426, *3 (Sept. 17, 1984)]. Rather, "[t]he use of unnecessary or excessive force by the arresting officer is a defense to the charge of resisting arrest." *Id.* Thus, the State's burden is to prove that the initiation of the arrest was lawful. Moreover, subsequent excessive force, for instance on the way to the jail or in the process of booking, should subject officers to civil liability but should not change the character of the defendant's criminal responsibility.

*Ellis* at ¶ 25.

{¶ 32} With regard to excessive force being an affirmative defense to resisting arrest, we stated that:

[*State v. Logsdon*, 3d Dist. Seneca No. 13-89-10, 1990 WL 197883 (Dec. 4, 19900] holds that "a claim of unnecessary or excessive force must be regarded as an affirmative defense to a charge of resisting arrest." *Logsdon.* It points out that the defense fits the second statutory-definition of an affirmative defense: "The defense is peculiarly within the knowledge of the defendant because only the defendant can adequately demonstrate to the trier of fact the point at which he felt he had to protect himself from the actions of the arresting officer." *Id.* "With an allegation of unnecessary

or excessive force in a resisting arrest charge," says *Logsdon*, "a defendant attempts to excuse or justify his actions in the classic nature of an affirmative defense, i.e. 'confession and avoidance.' " *Id.* "Thus," *Logsdon* continues, "the defendant effectively admits his resistance, if only to show that it was necessary in order to protect himself from the officer's excessive force." *Id*.

*Ellis* at ¶ 26.

**{¶ 33}** Finally, with regard to placing the burden of proof on the defendant, we stated the following in *Ellis*:

* * * [T]he burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." R.C. 2901.05(A). Non-affirmative defenses seek to negate the state's proof of an element, but affirmative defenses "represent not a mere denial or contradiction of evidence which the prosecution has offered as proof of an essential element of the crime charged, but, rather, they represent a substantive or independent matter 'which the defendant claims exempts him from liability even if it is conceded that the facts claimed by the prosecution are true.' " [*State v. Poole*, 33 Ohio St.2d 18, 19, 33 Ohio St.2d 18 (1973)]. Since the burden to prove all the elements of an offense beyond a reasonable doubt rests on the state—and never shifts—no part of an affirmative defense may negate an element of the offense. [*State v. Nucklos*, 171 Ohio App.3d 38, 2007-Ohio-1025, 869 N.E.2d 674, ¶ 38, citing *In re Winship*, 397 U.S. 358,

90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); and *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); and *State v. Frost*, 57 Ohio St.2d 121, 387 N.E.2d 235 (1979)]. The burden to prove an affirmative defense therefore may be placed on a defendant, without violating due process, so long as none of the affirmative-defense evidence raises a reasonable doubt about the state's proof that the defendant committed the charged offense. *See [Martin v. Ohio*, 480 U.S. 228, 233-234, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987)].

*Ellis* at ¶ 28.

{¶ 34} Relying on *Ellis*, we find that the trial court properly instructed the jury on the affirmative defense of excessive force for resisting arrest. More specifically, we find that the trial court properly instructed the jury that Armstrong-Carter had the burden to prove excessive force by a preponderance of the evidence. Regardless, Armstrong-Carter is prohibited from challenging the excessive force instruction since he requested the instruction that was given by the trial court, thereby inviting any error the trial court may have made. Therefore, having found no merit to any of the arguments raised herein, Armstrong-Carter's first assignment of error is overruled.

## Second Assignment of Error

{¶ 35} Under his second assignment of error, Armstrong-Carter contends that his convictions for failure to comply with the order or signal of a police officer, resisting arrest, and obstruction of official business were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree.

{¶ 36} Initially, we note that Armstrong-Carter has failed to preserve his sufficiency of the evidence argument for appeal because he did not move for a Crim.R. 29 judgment of acquittal with regard to the offenses in question.[1] " 'It is generally accepted in Ohio that if counsel fails to make and renew a Crim.R. 29 motion during a jury trial, the issue of sufficiency is waived on appeal.' " *State v. Combs*, 2d Dist. Montgomery No. 28559, 2020-Ohio-4084, ¶ 40, quoting *State v. Hartings*, 2d Dist. Montgomery No. 27471, 2018-Ohio-2035, ¶ 19. (Other citation omitted.) However, even if Armstrong-Carter had made a Crim.R. 29 motion, we would still find that his sufficiency of the evidence argument lacks merit.

{¶ 37} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 38} In contrast, "[a] weight of the evidence argument challenges the believability

---

[1] At trial, Armstrong-Carter only moved for a Crim.R. 29 acquittal as to a window tint violation charge in Case No. 2019-TRD-1423, which the trial court granted.

of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 39} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*Failure to Comply*

{¶ 40} As previously noted, Armstrong-Carter was convicted of failure to comply with the order or signal of a police officer in violation of R.C. 2921.331(A), which provides that: "No person shall fail to comply with any lawful order or direction of any police officer

invested with authority to direct, control, or regulate traffic." We have held that "the 'lawful order' of a police officer that R.C. 2921.331(A) contemplates, and with which an offender fails to comply in order for a violation to occur, is one that involves the offender's act or omission in operating a motor vehicle which, by law, an officer is charged with authority to direct, control, or regulate." *State v. Redd*, 2d Dist. Montgomery No. 20284, 2004-Ohio-4689, ¶ 19.

**{¶ 41}** In this case, the video and testimonial evidence presented at trial established that Off. Hartings and Off. Carter ordered Armstrong-Carter to pull his vehicle over for a traffic violation, i.e., failing to display a license plate.[2] Armstrong-Carter did not immediately stop his vehicle after the officers activated the overhead lights and siren on their cruiser. Instead, Armstrong-Carter continued to drive for approximately 25 seconds without slowing down, despite there being multiple places for him to pull over.

**{¶ 42}** Armstrong-Carter argues that his 25-second delay in pulling over was insufficient to establish that he failed to comply with the officers' traffic-stop order. However, even if this were true, the video evidence showed that even after Armstrong-Carter stopped his vehicle, he did not comply with Off. Hartings's subsequent order to provide his identification information. For approximately one minute and 25 seconds, the video showed Off. Hartings standing beside the driver-side door of the vehicle knocking on the window several times and ordering Armstrong-Carter to roll down the window and provide his identification.

---

[2] R.C. 4503.21(A)(1) provides that: "No person who is the owner or operator of a motor vehicle shall fail to display in plain view on the rear of the motor vehicle a license plate that displays the distinctive number and registration mark assigned to the motor vehicle by the director of public safety, including any county identification sticker and any validation sticker issued under sections 4503.19 and 4503.191 of the Revised Code[.]"

{¶ 43} Off. Hartings testified, and the video evidence confirmed, that after ordering Armstrong-Carter several times to roll down the window and provide his identification, Armstrong-Carter eventually cracked the driver-side window partially open and briefly communicated with Off. Hartings. During this time, Armstrong-Carter did not provide his identification, but told Off. Hartings to "talk to Todd" and complained about Off. Hartings's knocking on the vehicle's window. After this brief conversation, Off. Hartings testified that that Armstrong-Carter rolled the driver-side window back up. Off. Hartings then continued knocking on the window and ordering Armstrong-Carter to provide his identification. Shortly thereafter, Off. Hartings removed Armstrong-Carter from the vehicle and placed him under arrest with the help of other officers.

{¶ 44} When viewed in a light most favorable to the State, the evidence presented at trial established that Armstrong-Carter failed to timely pull his vehicle over for the traffic stop and never complied with Off. Hartings's order to provide his identification information. Therefore, we find that the State sufficiently established that Armstrong-Carter failed to comply with the order or signal of a police officer in violation of R.C. 2921.331(A). Also, after weighing all the evidence and reasonable inferences, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice in finding Armstrong-Carter guilty of failure to comply with the order or signal of a police officer.

*Resisting Arrest*

{¶ 45} Armstrong-Carter also challenges his conviction for resisting arrest in violation of R.C. 2921.33(A). To be convicted of resisting arrest, the State was required to present evidence establishing that Armstrong-Carter, recklessly or by force, resisted or

interfered with a lawful arrest of his person or another. R.C. 2921.33(A). In support of his sufficiency argument, Armstrong-Carter argues that the State failed to present evidence establishing that he was subject to a "lawful arrest."

{¶ 46} "Pursuant to R.C. 2921.33(A), '[a] lawful arrest is an essential element of the crime of resisting arrest.' " *State v. Burns*, 2d Dist. Montgomery No. 22674, 2010-Ohio-2831, ¶ 29, quoting *State v. Vactor*, 9th Dist. Lorain No. 02CA008068, 2003-Ohio-7195, ¶ 34. (Other citation omitted.) " 'An arrest is "lawful" if the surrounding circumstances would give a reasonable police officer cause to believe that an offense has been or is being committed.' " *State v. Street*, 2d Dist. Montgomery No. 26501, 2015-Ohio-2789, ¶ 27, quoting *State v. Blair*, 2d Dist. Montgomery No. 24784, 2012-Ohio-1847, ¶ 8. Thus, "the State must prove both 'that there was a reasonable basis to believe that an offense was committed, [and] that the offense was one for which the defendant could be lawfully arrested.' " *Burns* at ¶ 29, quoting *Vactor* at ¶ 34. (Other citations omitted.)

{¶ 47} "Moreover, an arrest is lawful if it is made on probable cause." (Citation omitted.) *State v. Crowder*, 2d Dist. Montgomery No. 22344, 2008-Ohio-3708, ¶ 16. " 'Generally, probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " *Id.*, quoting 26 Ohio Jurisprudence 3d, Criminal Law, Section 646. The State, however, does not have to prove that the defendant was in fact guilty of the offense for which the arrest was made to uphold a conviction for resisting arrest. *Street* at ¶ 27; *Burns* at ¶ 29; *Crowder* at ¶ 16.

{¶ 48} Based on our previous discussion concerning Armstrong-Carter's failure to

provide his identification information during a traffic stop, we find that the State presented sufficient evidence that the arresting officers had probable cause to arrest Armstrong-Carter for failure to comply with the order or signal of a police officer and for failing to present evidence of his identity following the minor misdemeanor license plate violation.[3] We note that Off. Hartings specifically testified that he effectuated Armstrong-Carter's arrest based on those offenses.

{¶ 49} We further find that the video and testimonial evidence established that Armstrong-Carter resisted his arrest. The evidence established that it took three officers to handcuff Carter. The officers testified, and the video evidence confirmed, that Armstrong-Carter wrestled with the officers and placed his arms underneath him while on the ground in order to prevent the officers from handcuffing him. The evidence also established that Armstrong-Carter resisted when the officers escorted him to the police cruiser. We also note that while in the back of the police cruiser, Armstrong-Carter commented that Off. Hartings was weak because he could not get his hands cuffed behind his back. Off. Hartings and Off. Carter further testified that Armstrong-Carter told them they were going to have to "work for it" while they were attempting to handcuff him. Therefore, when viewed in a light most favorable to the State, we find that there was sufficient evidence establishing that Armstrong-Carter used force to resist a lawful arrest in violation of R.C. 2921.33(A).

{¶ 50} Armstrong also contends that his conviction for resisting arrest was against

---

[3] "R.C. 2935.26(A)(2) provides that law enforcement officers are to issue citations rather than arrest people for minor misdemeanors unless '[t]he offender cannot or will not offer satisfactory evidence of his identity.' " *State v. Satterwhite*, 123 Ohio App.3d 322, 324, 704 N.E.2d 259 (2d Dist.1997), quoting R.C. 2935.26(A)(2).

the manifest weight of the evidence because the evidence established the affirmative defense of excessive force by the arresting officers. The video evidence established that Off. Hartings initiated the arrest by pulling Armstrong-Carter out of the vehicle. Thereafter, Off. Hartings and Off. Carter wrestled Armstrong-Carter to the ground. Both officers testified that Armstrong-Carter was face down on the ground with his arms underneath his body in a manner that prevented them from handcuffing him. In the cell-phone video captured by Kelley, Off. Hartings and Off. Carter can be seen struggling to get control of Armstrong-Carter's arms. Off. Hartings can also be seen striking Armstrong-Carter at least twice; however Off. Hartings testified that he applied four to five closed fist strikes to Armstrong-Carter's face. Off. Hartings also can be seen applying nine knee strikes to Armstrong-Carter's torso area.

{¶ 51} The video and testimonial evidence also established that Off. Carter pulled on Armstrong-Carter's right arm and used an asp as a lever in an attempt to pry Armstrong-Carter's right arm from underneath him. Off. Carter testified that he never struck Armstrong-Carter with the asp. The evidence further established that a third officer, Off. Orick, pulled on one of Armstrong-Carter's arms and delivered two closed fist strikes to Armstrong-Carter's forehead in an effort to assist the arrest.

{¶ 52} Off. Hartings and Off. Orick testified that they did not use all their force when striking Armstrong-Carter and that they were not trying to injure Armstrong-Carter when striking him. Off. Hartings also testified that the hand and knee strikes were pain compliance techniques that he was taught at the police academy. Detective Fuller, who testified regarding the types of force officers are trained to use with resistant individuals, indicated that open and closed hand strikes and knee strikes were pain compliance

techniques that officers are taught to use when a resistant individual is wrestling with an officer.

{¶ 53} Although there was evidence presented at trial indicating that Armstrong-Carter suffered a seizure and claimed he could not breathe after he was handcuffed, there was also evidence presented indicating that Armstrong-Carter's seizure and breathlessness were a façade. For example, the video evidence established that Armstrong-Carter had enough breath to continuously scream "I can't breathe" for 25 seconds. Off. Hartings also testified that he was doing nothing to restrict Armstrong-Carter's airflow while he was screaming that he could not breathe.

{¶ 54} The evidence also established that Armstrong-Carter smiled and said "gotcha bitch" to the officers while he was allegedly seizing. The testimony of medic Kyle Crofford also indicated that Armstrong-Carter's cognitive ability minutes after the arrest was inconsistent with him having had a shaking (tonic clonic) type seizure. Further, Armstrong-Carter did not provide any medical records evidencing injuries he sustained from the arrest or any medical records verifying his alleged history of seizures. Additionally, the video evidence showing Armstrong-Carter in the backseat of the police cruiser and the photographic evidence taken of Armstrong-Carter following his arrest did not show any visible injuries on Armstrong-Carter's body with the exception of a small lump on his forehead.

{¶ 55} From this evidence, the jury could have reasonably determined that the arresting officers did not use excessive force when arresting Armstrong-Carter. Accordingly, after weighing all the evidence, we cannot say that the jury lost its way or created a manifest miscarriage of justice in finding that Armstrong-Carter had failed to

prove the affirmative defense of excessive force. Therefore, in addition to being supported by sufficient evidence, Armstrong-Carter's conviction for resisting arrest was also not against the manifest weight of the evidence.

*Obstruction of Official Business*

{¶ 56} Armstrong-Carter also challenges his conviction for obstruction of official business under R.C. 2921.31(A). Pursuant to that statute: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A).

{¶ 57} "Ohio courts have consistently held that in order to violate the obstructing official business statute a defendant must engage in some affirmative or overt act or undertaking that hampers or impedes a public official in the performance of the official's lawful duties, as opposed to merely failing or refusing to cooperate or obey a police officer's request for information." *State v. Prestel*, 2d Dist. Montgomery No. 20822, 2005-Ohio-5236, ¶ 16; *State v. Crawford*, 2d Dist. Montgomery No. 25506, 2013-Ohio-4398, ¶ 17 ("A mere failure or refusal to respond to an officer's request does not constitute obstructing official business."). However, " 'the total course of the defendant's conduct must be considered' as opposed to 'viewing the acts of a defendant in isolation.' " *State v. Greenlee*, 2d Dist. Montgomery No. 28756, 2021-Ohio-455, ¶ 15, quoting *State v. Overholt*, 9th Dist. Medina No. 2905-M, 1999 WL 635717, *2 (Aug. 18, 1999) (finding defendant's refusal to leave the scene and interference with an officer's attempts to

complete an arrest, as well as profane outbursts, were sufficient to constitute the offense of obstructing official business).

{¶ 58} With regard to the element of hampering or impeding an officer in performing his lawful duties, " 'there must be some substantial stoppage of the officer's progress.' " *Ellis*, 2d Dist. Montgomery No. 24003, 2011-Ohio-2967 at ¶ 59, quoting *State v. Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, 879 N.E.2d 215, ¶ 17. There is, however, "no 'finite period of time [that] constitutes a "substantial stoppage." * * * If the record demonstrates that the defendant's act hampered or impeded the officer in the performance of his duties, the evidence supports the conviction.' " *Id.*, quoting *Wellman* at ¶ 18. Thus, " 'this element does not require that [the defendant] cause the officers to fail in their duties, but only that, by acting, [the defendant] disrupted their performance of them.' " *State v. Terry*, 2d Dist. Montgomery No. 26722, 2016-Ohio-3484, ¶ 22, quoting *State v. McCoy*, 2d Dist. Montgomery No. 22479, 2008-Ohio-5648, ¶ 16.

{¶ 59} In this case, the evidence established that Armstrong-Carter engaged in several affirmative actions that hampered or impeded the officers in performing their official duties. For example, the evidence established that Armstrong-Carter failed to immediately stop his vehicle, failed to roll down his window immediately upon request, and failed to provide his identification information to the officers, which ultimately led to his arrest. By engaging in this conduct, the jury could have found that Armstrong-Carter hampered the officers in performing their lawful duty of issuing him a traffic citation for the license plate violation. "Simply by virtue of the fact that his conduct was such that the officers had to arrest him, [a defendant] impeded their ability to complete their duties with respect to the initial traffic stop." *Ellis* at ¶ 61.

{¶ 60} The evidence also established that what should have been a 15 to 20 minute traffic stop turned into a three to four hour ordeal due to Armstrong-Carter's failing to put his hands behind his back and wrestling with the officers when they were trying to handcuff him. Armstrong-Carter's conduct not only hindered the officers' lawful duty to arrest him, but, because force was used during the arrest, it resulted in the officers having to spend several hours with Armstrong-Carter at the hospital. Therefore, when viewing the evidence in a light most favorable to the State, a reasonable fact finder could have concluded that Armstrong-Carter's purposeful conduct hindered the officers in performing their lawful duties and thus obstructed official business in violation of R.C. 2921.31(A).

{¶ 61} Armstrong-Carter, nevertheless, argues that the weight of the evidence established that the officers were not engaged in lawful duties when he hampered their progress. He claims that the officers were not engaged in lawful duties because they used excessive force during the encounter. However, the affirmative defense of excessive force only applies to resisting arrest. In any event, we have already determined that the jury could have concluded from the evidence that the amount of force used by the officers was not excessive.

{¶ 62} The evidence also established that Armstrong-Carter had already committed the obstruction offense prior to any force being used against him. From the evidence, the jury could have determined that Armstrong-Carter first obstructed official business when he failed to stop and present his identification to the officers. Therefore, after weighing all the evidence and reasonable inferences, we do not find that the jury lost its way and created a manifest miscarriage of justice in finding Armstrong-Carter guilty of obstructing official business.

{¶ 63} For the foregoing reasons, we conclude that Armstrong-Carter's conviction for failure to comply with the order or signal of a police officer, resisting arrest, and obstruction of official business were supported by sufficient evidence and were not against the manifest weight of the evidence. Therefore, Armstrong-Carter's second assignment of error is overruled.

**Third Assignment of Error**

{¶ 64} Under his third assignment of error, Armstrong-Carter contends that the trial court erred in overruling his objection to the appointment of an acting judge for his trial. Specifically, Armstrong-Carter claims that the appointment violated R.C. 1901.121(C) because the trial court failed to establish that another Dayton Municipal Court judge was unavailable on the scheduled trial dates. We disagree.

{¶ 65} R.C. 1901.121 governs the appointment of an acting judge in a municipal court. Section (C) of the statute provides that when there is a vacancy in a municipal court with three or more judges (such as the Dayton Municipal Court), the court's presiding judge has the option to either appoint an appropriate substitute as "acting judge" or to request that the Supreme Court of Ohio assign a sitting judge of another court or a retired judge to temporarily serve as an "assigned judge." The statute specifically states as follows:

> If a vacancy occurs in the office of a judge of a municipal court that consists of three or more judges or if a judge of a municipal court of that nature is incapacitated, unavailable, or temporarily absent, the presiding judge may do either of the following:

(1) If no other judge of the court is available to perform the duties of the judge, appoint a substitute who is a resident of the territory of the court. The appointee shall either be admitted to the practice of law in this state and have been, for a total of at least six years preceding appointment, engaged in the practice of law in this state or a judge of a court of record in any jurisdiction in the United States or be a retired judge of a court of record. The appointee shall be styled "acting judge" and shall temporarily serve on the court during the vacancy or the incapacity, unavailability, or temporary absence of the incumbent judge.

(2) Request the chief justice of the supreme court to assign a sitting judge of another court of record or a retired judge of a court of record to temporarily serve on the court in accordance with rules adopted by the supreme court pursuant to division (A)(1) of Section 5 of Article IV, Ohio Constitution. The assignee shall be styled "assigned judge" and shall serve for any period of time the chief justice may prescribe.

R.C. 1901.121(C)(1)-(2).

{¶ 66} In support of his appeal, Armstrong-Carter argues that it was inappropriate for the presiding judge of the municipal court to appoint an acting judge under R.C. 1901.121(C) because the municipal court's website indicated that two of the court's judges were available on the dates of his trial. Upon review, we find nothing in the record supporting Armstrong-Carter's claim regarding the municipal court's website. Even if we were to assume that the municipal court's website had indicated that there were two judges available to attend Armstrong-Carter's trial, the fact remains that, in the entry

appointing the acting judge, the presiding judge of the municipal court made a specific finding that no other judges of the court were available.  The alleged inconsistency between the website (which may or may not have been up to date) and the presiding judge's finding would be properly resolved in favor of the presiding judge's finding. Therefore, we find that the presiding judge complied with the authority granted to him in R.C. 1901.121(C) when he appointed an acting judge for Armstrong-Carter's trial.

{¶ 67} Regardless of this finding, it is well established that "[a] judge's appointment as an acting judge may not be challenged in a collateral proceeding to which the judge is not a party."  *State v. Baumgartner*, 6th Dist. Ottawa No. OT-03-013, 2004-Ohio-3907, ¶ 11, citing *State ex rel. Sowell v. Lovinger*, 6 Ohio St.3d 21, 23, 450 N.E.2d 1176 (1983), citing *Stiess v. State*, 103 Ohio St. 33, 41-42, 132 N.E. 85 (1921) and *State v. Staten*, 25 Ohio St.2d 107, 110, 267 N.E.2d 122 (1971*), vacated in part on other grounds,* 408 U.S. 938 (1972).  *Accord State v. Hill*, 2d Dist. Montgomery No. 24966, 2012-Ohio-5210, ¶ 22. Therefore, the issue of whether the appointment of an acting judge was unlawful "is not be reviewable on appeal from an adverse judgment rendered in [a] criminal proceeding." *Hill* at ¶ 22, citing *Lovinger*.  *See also State v. Shearer*, 11th Dist. Portage No. 93-P-0052, 1994 WL 587769, *1 (Sept. 30, 1994).  "Those challenges must instead be made in an original action in quo warranto to determine whether the judge had a valid title to her office, in which proceeding the judge herself would be made a party defendant and have an opportunity to appear and make a defense thereto."  *Hill* at ¶ 22, citing *Stiess* at 41.  *See also Staten* at 110.

{¶ 68} Because Armstrong-Carter failed to demonstrate that the appointment of the acting judge violated R.C. 1901.121(C), and because the lawfulness of said

appointment cannot be challenged in an appeal from an adverse judgment rendered in a criminal proceeding, Armstrong-Carter's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 69} Under his fourth assignment of error, Armstrong-Carter alleges five instances of prosecutorial misconduct during his trial that he claims resulted in unfair prejudice. Three of the claims concern certain testimony and evidence presented by the State at trial. Two of the claims concern certain comments made by the State during its closing argument. For the reasons outlined below, we find that each of Armstrong-Carter's prosecutorial misconduct claims lacks merit.

{¶ 70} "When reviewing a claim of prosecutorial misconduct, our inquiry is twofold: we must first decide whether the prosecutor's actions were improper, and if so, we consider whether the conduct prejudicially affected the defendant's substantial rights." *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 115, citing *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 228. " 'The touchstone of due process analysis * * * is the fairness of the trial, not the culpability of the prosecutor.' " *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "Thus, '[t]he relevant question is whether the prosecutors' [conduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.*, quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "Where it is clear beyond a reasonable doubt that the trier of fact would have found the defendant guilty, even absent the alleged misconduct, the

defendant has not been prejudiced, and his conviction will not be reversed." *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 110, citing *State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21.

*Fleeing Vehicle Testimony*

**{¶ 71}** Armstrong-Carter first contends that the State engaged in prosecutorial misconduct by presenting testimony from Off. Orick regarding an incident that occurred the night before Armstrong-Carter's arrest. Specifically, Off. Orick testified that a black Monte Carlo with dark tinted windows fled from him while he was attempting to conduct a traffic stop. Armstrong-Carter objected to this testimony on relevance grounds. At a sidebar, the State explained that Off. Orick would testify that Armstrong-Carter's vehicle drew his attention on the day in question because he thought it was the same vehicle that had fled from him the night before, but later discovered that the vehicles were not the same.

**{¶ 72}** After hearing the parties' arguments, the trial court overruled Armstrong-Carter's objection and indicated that Off. Orick could testify about the fleeing vehicle since it explained why Off. Orick was at the scene. However, the trial court ruled that the State could not get into any specifics about the fleeing vehicle and that the State needed to clarify that the vehicles were not the same. Thereafter, the State's direct examination of Off. Orick arguably did not clarify that Armstrong-Carter was not driving the fleeing vehicle. Despite this failure, the fact that Armstrong-Carter was not driving the fleeing vehicle was later clarified to the jury during the following portion of Off. Orick's cross-examination:

Defense Counsel:   Just to clarify, there was a mention about a car the previous night. It was ultimately determined that the car that [Armstrong-Carter] was driving was not the car in question that night, correct?

Off. Orick:        That is correct.

Trial Trans. p. 312-313.

{¶ 73} Even if the jury had momentarily inferred that Armstrong-Carter had been driving the fleeing vehicle the night prior to his arrest, that misconception was dispelled during Off. Orick's cross-examination. Therefore, because any confusion that may have arisen was later clarified during Off. Orick's cross-examination, Armstrong-Carter was not prejudice by the State's failure and thus cannot establish a claim of prosecutorial misconduct.

*Use of Force Continuum and Safety Risk Testimony*

{¶ 74} Armstrong-Carter next contends that the State engaged in prosecutorial misconduct by presenting Det. Fuller's testimony regarding "the use of force continuum" taught to officers in training in conjunction with hypothetical safety risk factors that were not proven to have existed in the instant case. Specifically, Armstrong-Carter argues that he was prejudiced due to "the efforts by State, over objection: 1) to first link good faith safety risk factors faced by officers and bystanders in the field to be indelibly interwoven into the "policy" force continuum chart(s); and 2) then use leading question[s] to imply that all subject officer actions were in compliance thereto, even though the subject risk factors were never proven to exist."

{¶ 75} Upon review, we see nothing improper about the contested testimony. Det. Fuller did not specifically testify about the incident in question and made no opinion as to whether the arresting officers used excessive force. Det. Fuller instead simply provided general testimony about safety risk factors that officers face when dealing with resistant individuals and the use of force continuum that officers are taught to use when deciding how much force to use against resistant individuals. Moreover, as discussed more fully below under Armstrong-Carter's fifth assignment of error, the contested testimony was well within Det. Fuller's personal knowledge and experience and was properly admitted under Evid.R. 701. Therefore, because it was not improper for the State to elicit the testimony at issue, Armstrong-Carter has failed to establish a claim of prosecutorial misconduct.

*Closing Argument*

{¶ 76} Armstrong-Carter additionally argues that the State engaged in prosecutorial misconduct during its closing argument. First, Armstrong-Carter argues that it was improper for the State to tell the jury that he could not satisfy his burden of proof for excessive force because there were no medical records admitted into evidence establishing that he had a seizure. Armstrong-Carter claims this statement created confusion regarding the burden of proof and thus prejudiced him.

{¶ 77} After reviewing the comment at issue, we fail to see how it could have caused confusion on the burden of proof. The State simply said that:

> Defense in this case wants you to believe that those officers caused
> a seizure to the defendant in this case. * * *[N]o one in this cas[e] that's

testified, can testify whether * * * or not it was a real seizure. None of the witnesses that came through can testify whether or not he was having a real seizure. Well that's a problem for the defense in this case because remember, it's their burden. They want you to believe that the officers were using so much force he has this seizure but you have heard from nobody in this case that proves that. You've seen not one medical record. Remember [Armstrong-Carter] was taken right to the hospital, checked right out, and he was there for two hours. Where are the medical records in this case? * * * Wouldn't you like to see some medical records in this case that told you that he actually had a seizure?"

Trial Trans. p. 629-630.

{¶ 78} The foregoing statement is factually accurate as to the evidence presented at trial and it relays the correct burden of proof for the affirmative defense of excessive force. Therefore, because the challenged statement was proper, the fact that the State made such a comment cannot amount to prosecutorial misconduct.

{¶ 79} Armstrong-Carter also claims that the State improperly told the jury during closing argument that it had fully satisfied its burden of proof for the charged offenses because Armstrong-Carter's arrest took three to four hours instead of 20 minutes. The comment which Armstrong-Carter is referring to is shown below:

So in this case, if you find beyond a reasonable doubt that the defendant failed to comply with the officers, not only by failing to stop his vehicle, but also by failing to give I.D., failing to roll down a window. Doing any of those things, any one of those would be failure to comply. If you

find him guilty, the defendant guilty of that.

If you find that the officers were delayed in their duties in this case. ***What should have been a fifteen minute traffic stop ends up being this four-hour ordeal.*** If you find that they're hindered or delayed by the Defendant's actions and you find him guilty of that.

The affirmative defense of excessive use of force has nothing to do with any of those charges. That defense only has to do with resisting arrest and the way that goes is, if you find in this case that the defendant resisted arrest, * * * you then move on and you look at this affirmative defense of excessive force.

(Emphasis added.) Trial Trans. p. 623-24.

{¶ 80} Having reviewed the foregoing statement, we fail to see where in the statement the State indicated that it had satisfied its burden of proof on all the charges due to the incident lasting three to four hours as opposed to 20 minutes. It is clear from the context of the language that the State was referring to the obstruction of official business charge when it said: "What should have been a fifteen minute traffic stop ends up being a four hour ordeal." Following that comment, the State indicated that the affirmative defense of excessive force had nothing to do with the obstruction or failure to comply charges, but only applied to resisting arrest. These comments were accurate and not inflammatory, as Off. Hartings specifically testified that a normal traffic stops take 15 to 20 minutes and that this incident, which began as a regular traffic stop, ended up taking three to four hours. Therefore, we do not find that the statement was improper or in any way prejudicial so as to amount to prosecutorial misconduct.

*Backseat Cruiser Camera Video*

**{¶ 81}** Armstrong-Carter further argues that the State engaged in prosecutorial misconduct by presenting video footage taken while he was in the backseat of the police cruiser following his arrest. Armstrong-Carter claims that the backseat video was irrelevant and prejudicial because it depicted events that were separate and independent from his criminal conduct. We note that Armstrong-Carter raised these arguments in a motion in limine, which the trial court overruled. In overruling the motion, the trial court found that the video footage was relevant and admissible.

**{¶ 82}** Upon review, we agree with the trial court's relevancy determination. The video depicted some resistance by Armstrong-Carter while he was getting into the vehicle and also showed Armstrong-Carter's physical and mental condition after the arrest. The video additionally contained relevant statements Armstrong-Carter made to the officers regarding his resistance during the arrest. Regardless, even when accepting Armstrong-Carter's arguments, it is well established that " 'it is not prosecutorial misconduct to introduce evidence that the trial court has determined to be admissible.' " *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 243, quoting *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 187. Therefore, because the trial court found the backseat video admissible, playing it at trial and eliciting testimony from it was not improper and did not amount to prosecutorial misconduct.

**{¶ 83}** For all the foregoing reasons, Armstrong-Carter's fourth assignment of error is overruled.

**Fifth Assignment of Error**

{¶ 84} Under his fifth assignment of error, Armstrong-Carter contends that the cumulative effect of all the errors in this case deprived him of a fair trial and warrants a reversal of his conviction. We disagree.

{¶ 85} "Under the doctrine of cumulative error, we may reverse a judgment of conviction 'when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.' " *Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, at ¶ 277, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. Thus, " '[i]n order to find cumulative error, we first must find that multiple errors were committed at trial.' " *In the Matter of S.W.E.*, 2d Dist. Greene No. 2020-CA-27, 2021-Ohio-80, ¶ 24, quoting *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 40.

{¶ 86} The cumulative error asserted by Armstrong-Carter is based, in part, on the errors alleged in his other assignments of error. Given that we have found no merit to any of those claims, they cannot form the basis of a cumulative error argument.

{¶ 87} Armstrong-Carter also raises several other arguments in support of his cumulative error claim. For instance, Armstrong-Carter argues that Det. Fuller's testimony regarding officer use of force and defense tactics training was expert testimony that lacked a proper foundation. Det. Fuller, however, was not presented as an expert witness and did not provide expert testimony at trial. Evid.R. 702 provides that a witness may testify as an expert if all the following apply:

(A) The witness' testimony either relates to matters beyond the

knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B)     The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C)     The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

{¶ 88} Thus, an expert witness is " 'qualified by knowledge, skill, experience, training, or education to provide a scientific, technical, or other specialized opinion about the evidence or a fact issue[.]' " *State v. Lavender*, 2019-Ohio-5352, 141 N.E.3d 1000, ¶ 95, quoting *State v. Fread*, 12th Dist. Butler No. CA2013-03-045, 2013-Ohio-5206, ¶ 14 (1st Dist.), citing *Black's Law Dictionary* (8th Ed.2004) 1633. In contrast, a lay witness is "not testifying as an expert" and is restricted to giving "opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701.

{¶ 89} In *State v. McKee*, 91 Ohio St.3d 292, 744 N.E.2d 737 (2001), the Supreme Court of Ohio discussed the interplay between lay witness opinion testimony under Evid.R. 701 and expert testimony under Evid.R. 702 and stated the following:

It is consistent with this emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. * * * Although these cases are of a technical nature in that they allow

lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

(Footnote omitted.) *Id.* at 296-297.

{¶ 90} " 'It is well-settled that a police officer may testify concerning matters that are within his experience and observations that may aid the trier of fact in understanding the other testimony pursuant to Evid.R. 701.' " *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 108 (2d Dist.), citing *State v. Tatum*, 10th Dist. Franklin No. 10AP-626, 2011-Ohio-907, ¶ 17. For example, in *Jones* we held that a detective's testimony that it was common for children to delay reporting abuse and for children to have difficulty with the chronology of events and to blend events together was within the detective's personal knowledge and experience and was thus permissible under Evid.R. 701. *Jones* at ¶ 110-111.

{¶ 91} In this case, Det. Fuller generally testified about the types of force and defense tactics officers are trained to use in certain situations and what kinds of safety risks officers face when dealing with resistant individuals. At no point in time did Det. Fuller testify about the specific incident involving Armstrong-Carter nor did Det. Fuller opine as to whether the officers who arrested Armstrong-Carter used excessive force. Although Det. Fuller's testimony was not within the realm of common knowledge, it did not rise to the level of scientific expertise contemplated under Evid.R. 702. Because Det.

Fuller testified to training officers on use of force and defense strategy tactics for 12 years, we find that his testimony concerned matters that were well within his knowledge and personal experience. We also find that Det. Fuller's testimony was helpful in determining the excessive force issue. Therefore, Det. Fuller's testimony was proper lay witness testimony under Evid.R. 701 and did not require expert foundation.

{¶ 92} In further support of finding cumulative error, Armstrong-Carter argues that improper opinion testimony was permitted at trial when Off. Hartings testified that he did not believe Armstrong-Carter was having a real seizure. After reviewing the testimony at issue, we find that it was also proper lay witness testimony under Evid.R. 701.

{¶ 93} Off. Hartings testified that while Armstrong-Carter was allegedly seizing, "he looks up at us and says gotcha bitch and starts smiling. So, that's fake." Trial Tans. p. 369-370. The State then asked: "That's your opinion, at that point, that he is not having a real seizure[?]" and Off. Hartings responded: "That's correct. * * * Correct, not a real seizure." *Id.* at 370. Although this testimony provided Off. Hartings's opinion that Armstrong-Carter was faking a seizure, the opinion was not based on any scientific or technical information that would require an expert. Instead, Off. Hartings's testimony was rationally based on his perception of what he saw and heard, i.e., that Armstrong-Carter smiled and said "gotcha bitch" while he was allegedly in the midst of seizing. Because the opinion testimony at issue was rationally based on the perception of the witness and was helpful for the jury to determine the excessive force issue, it met both lay opinion testimony requirements under Evid.R. 701. Therefore, Off. Hartings's opinion testimony was proper.

{¶ 94} Lastly, Armstrong-Carter argues that the resisting arrest and obstruction of

official business offenses were allied offenses of similar import that the trial court should have merged at sentencing. We decline to address the merits of this claim because, even if merging the offenses had been appropriate, the allied offense argument is moot since Armstrong-Carter already served his jail sentence and has no meaningful remedy on appeal. *See State v. Smith,* 2d Dist. Montgomery No. 24402, 2012-Ohio-734, ¶ 26.

**{¶ 95}** "It is well settled that 'where a criminal defendant, convicted of a misdemeanor, voluntarily satisfies the judgment imposed upon him or her for that offense, an appeal from the conviction is moot unless the defendant has offered evidence from which an inference can be drawn that he or she will suffer some collateral legal disability or loss of civil rights stemming from that conviction.' " *City of Dayton v. Elifritz*, 2d Dist. Montgomery No. 19603, 2004-Ohio-455, ¶ 4, quoting *State v. Golston*, 71 Ohio St.3d 224, 226, 643 N.E.2d 109 (1994), citing *State v. Wilson*, 41 Ohio St.2d 236, 325 N.E.2d 236 (1975), and *State v. Berndt*, 29 Ohio St.3d 3, 504 N.E.2d 712 (1987).

**{¶ 96}** "A defendant can show that he did not serve a sentence voluntarily if he sought a stay of the sentence to allow for the appeal." *State v. Smith*, 2d Dist. Montgomery No. 27981, 2019-Ohio-3592, ¶ 10, citing *City of Cleveland Hts. v. Lewis*, 129 Ohio St.3d 389, 2011-Ohio-2673, 953 N.E.2d 278, ¶ 23. A defendant "can also demonstrate that he involuntarily served the sentence by showing that he served the entire sentence prior to his conviction." *Id.*, citing *State v. Benson*, 29 Ohio App.3d 109, 110, 504 N.E.2d 77 (10th Dist.1986). Neither one of these circumstances applies to Armstrong-Carter. Furthermore, Armstrong-Carter does not suggest, nor can we discern, any collateral legal disability or loss of civil rights resulting from his conviction for resisting arrest and obstruction of official business.

{¶ 97} Because Armstrong-Carter only received jail sentences for the resisting arrest and obstruction of official business offenses, and because he has completed those sentences voluntarily, his allied offense argument as to those offenses is moot.   In any event, such an error by itself does not amount to cumulative error that would warrant reversing his conviction.   Therefore, Armstrong-Carter's fifth assignment of error is overruled.

## Conclusion

{¶ 98} Having overruled all of Armstrong-Carter's assignments of error, his judgment of conviction is affirmed.

. . . . . . . . . . . .


DONOVAN, J. and HALL, J., concur.


Copies sent to:

Lindsay E. Bozanich
Carlo C. McGinnis
Hon. Colette Moorman, Acting Judge